Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Meta Payments, Inc.
f/k/a Facebook Payments, Inc.; Meta Platforms
Technologies, LLC f/k/a Facebook Technologies,
LLC; Instagram, LLC; and Siculus LLC f/k/a
Siculus, Inc.*

*[Additional parties and counsel listed on
signature pages]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*Breathitt County Board of Education v. Meta Platforms, Inc.*, et al. | MDL No. 3047<br><br>Case No.: 4:23-cv-01804-YGR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (BREATHITT) (SD MSJ No. 1)**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Defendants on all claims by Plaintiff Breathitt County Board of Education ("Breathitt").  This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declaration of Ashley M. Simonsen and the exhibits thereto, and any other matters presented at the time of the hearing.

## STATEMENT OF RELIEF SOUGHT

Defendants seek entry of summary judgment in their favor on all causes of action that Breathitt asserts against Defendants or, in the alternative, partial summary judgment as to Breathitt's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

DATED:  September 30, 2025

Respectfully submitted,

By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments, Inc. f/k/a Facebook Payments, Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

*[Additional counsel listed on signature pages]*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................2

II.     BACKGROUND .....................................................................................................................4

        A.      Breathitt County School District...............................................................................4

        B.      Breathitt's Lack of Evidence ....................................................................................5

        C.      Breathitt's Theory of Damages .................................................................................6

        D.      Breathitt's Proposed "Strategic Plan".......................................................................8

        E.      The Court's Motion-to-Dismiss Ruling .....................................................................9

III.    LEGAL STANDARD............................................................................................................11

IV.     ARGUMENT........................................................................................................................12

        A.      Breathitt Lacks Competent Evidence of Causation. ...............................................12

                1.      Breathitt's Allegations of Specific Harms All Impermissibly Rely on Third Party Content and Protected Publishing Activities. .......................................................13

                2.      Breathitt Has No Competent Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform. .........................................................................16

        B.      Breathitt Cannot Show It Is Entitled to Past Damages. ..........................................20

                1.      Breathitt Cannot Show Defendants Caused It to Divert Financial Resources.......21

                2.      Breathitt Has No Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms. ......................................................................................24

                3.      Breathitt Cannot Recover Property Damage, which Results from Third-Party Acts. ...............................................................................................................27

        C.      Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy under the Law. .................................................................................................................27

                1.      Breathitt Cannot Recover the Plan as Equitable Relief for Its Nuisance Claim....28

                2.      The Costs of the Strategic Plan Are Not Recoverable as Future Damages. ..........32

                3.      Breathitt's Strategic Plan Is Impermissibly Derivative. ....................................33

        D.      Defendants Are Entitled to Summary Judgment on Breathitt's Failure-to-Warn Claim...34

                1.      Defendants Do Not Owe Breathitt a Duty To Warn the District Directly.............34

2. Breathitt Lacks Evidence Supporting Its Failure to Warn Claim. .........................35

3. Breathitt Cannot Assert a Claim that Defendants Failed To Warn Students. ........37

E. Breathitt's Claims Are Barred by the Statute of Limitations.............................................38

F. At a Minimum, the Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries. ...................................39

V. CONCLUSION......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................................11

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) ...............................................................................................33

*Block v. City of Los Angeles*,
253 F.3d 410 (9th Cir. 2001) ...............................................................................................23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)..............................................................................................................23

*Broyles v. Maudilio*,
2021 WL 5988272 (W.D. Ky. Oct. 21, 2021) ...............................................................20, 22, 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................................................11

*Certainteed Corp. v. Fletcher*,
794 S.E.2d 641 (Ga. 2016)...................................................................................................35

*City of Huntington v. AmerisourceBergen Drug Corp.*,
609 F. Supp. 3d 408 (S.D.W.V. 2022)..................................................................................30

*Commonwealth v. S. Covington & C. St. Ry. Co.*,
181 Ky. 459, 205 S.W. 581 (1918) ......................................................................................12

*Dodd v. Dyke Indus.*,
518 F. Supp. 2d 970 (W.D. Ky. 2007)..................................................................................38

*Doe (K.B.) v. Backpage.com*,
LLC, 724 F. Supp. 3d 882 (N.D. Cal. 2024)...................................................................16, 20

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) ............................................................................................34

*Doe v. Pharmacia & Upjohn Co.*,
879 A.2d 1088 (Md. Ct. App. 2005).....................................................................................37

*Duty v. U.S. Dep't of Interior*,
735 F.2d 1012 (6th Cir. 1984) ..............................................................................................20

*Edwards Lifesciences Corp. v. St. Jude Med. Inc.*,
2004 WL 5642457 ................................................................................................................23

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*,
    112 F.4th 1168 (9th Cir. 2024) ...............................................................................................15, 34

*Exec. Branch Ethics Comm'n v. Grimes*,
    710 S.W.3d 8 (Ky. Ct. App. 2025) .................................................................................................38

*Franzman v. Wyeth, Inc.*,
    451 S.W.3d 676 (Mo. Ct. App. 2014)...........................................................................................38

*Gassaway Constr. Co. v. Gentry*,
    264 S.W.2d 658 (Ky. 1954) ...........................................................................................................21

*In re Gen. Motors LLC Ignition Switch Litig.*,
    339 F. Supp. 3d 262 (S.D.N.Y. 2018).........................................................................................21

*Gourdine v. Crews*,
    955 A.2d 769 (Md. Ct. App. 2008)..........................................................................................35, 37

*Harris v. Jiangsu ASG Earth Env't Prot. Sci. & Tech. Co., Ltd.*,
    2017 WL 2990279 (E.D. Ky. July 13, 2017)...........................................................................20, 24

*Hellmueller Baking Co. v. Risen*,
    295 Ky. 273, 174 S.W.3d 134 (1943) ..........................................................................................21

*Henricksen v. ConocoPhillips Co.*,
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ...................................................................................17

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) .............................................................................................................30

*Jones by & through Jones v. IC Bus, LLC*,
    626 S.W.3d 661 (Ky. Ct. App. 2020) ......................................................................................35, 36

*In re JUUL Labs Inc. Marketing, Sales Pract. & Prods. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020) ........................................................................................32

*Khoros, LLC v. Lenovo (United States), Inc.*,
    2020 WL 12655516 (N.D. Cal. Oct. 5, 2020)..............................................................................39

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ......................................................................................................15

*Kuciemba v. Victory Woodworks, Inc.*,
    531 P.3d 924 (Cal. 2023) ...............................................................................................................35

*Lemmon v. Snap Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ......................................................................................................16

*Lynn Min. Co. v. Kelly*,
    394 S.W.2d 755 (Ky. 1965)...........................................................................................................38

vi

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ...............................................................................................16

*Mattingly v. R.J. Corman R.R. Grp., LLC*,
90 F.4th 478 (6th Cir. 2024) .................................................................................................39

*May v. Holzknecht*,
320 S.W.3d 123 (Ky. Ct. App. 2010) ........................................................................29, 32, 33

*Mayor & City Council of Baltimore v. Purdue Pharma, L.P.*,
No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025) ...........................................................31, 32

*Mullins v. Appalachian Regional Healthcare, Inc.*,
707 S.W.3d 1 (Ky. Ct. App. 2025) .............................................................................17, 19, 24

*In re Nat'l Prescrip. Opiate Litig.*,
No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025).......................................................31

*In re Nat'l Prescription Opiate Litig.*,
179 Ohio St. 3d 74 (2024).....................................................................................................31

*Nelson v. Am. Honda Motor Co.*,
2021 WL 2877919 (W.D. Penn. May 17, 2021)....................................................................36

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .........................................................................................16, 19

*Patton v. Bickford*,
529 S.W.3d 717 (Ky. 2016) .............................................................................................12, 13

*People v. ConAgra Grocery Products Co.*,
17 Cal. App. 5th 51 (2017) ...................................................................................................32

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ................................................................................................23

*Rhynes v. Stryker Corp.*,
2011 WL 2149095 (N.D. Cal. May 31, 2011) ......................................................................29

*Roberie v. VonBokern*,
2006 WL 2454647 (Ky. Aug. 24, 2006).........................................................................12, 29

*Robinson v. C.R. Bard, Inc.*,
2016 WL 3361825 (N.D. Cal. June 17, 2016) ......................................................................29

*Schwartz v. Hasty*,
175 S.W.3d 621 (Ky. Ct. App. 2005) ....................................................................................21

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ..........................................................................................28, 29

*Soremekun v. Thrifty Payless, Inc.*,
 509 F.3d 978 (9th Cir. 2007) ..................................................................................................11

*Twitter, Inc. v. Barr*,
 445 F. Supp. 3d 295 (N.D. Cal. 2020) ....................................................................................11

*VFD Consulting, Inc. v. 21st Servs.*,
 425 F. Supp. 2d 1037 (N.D. Cal. 2006) ..................................................................................13

*In re Williams Sec. Litigation-WCG Subclass*,
 558 F.3d 1130 (10th Cir. 2009) .........................................................................................16, 20

*Wiseman v. Alliant Hosps., Inc.*,
 37 S.W.3d 709 (Ky. 2000) .......................................................................................................38

*Wood v. Marathon Refin. Logistics Serv. LLC*,
 2024 WL 2242688 (N.D. Cal. Mar. 21, 2024)........................................................................28

**Statutes**

K.R.S. § 413.120..........................................................................................................................38

K.R.S. § 413.140..........................................................................................................................38

**Other Authorities**

Fed. R. Civ. P. 56.........................................................................................................................11

Fed. R. Evid. 602 .........................................................................................................................23

Fed. R. Evid. 702 ..............................................................................................................8, 17, 23

Fed. R. Evid. 801 .........................................................................................................................23

Restatement (Second) of Torts § 821B (1979) ...........................................................................12

**SCHOOL DISTRICT MOTION FOR SUMMARY JUDGMENT "ROAD MAP"**

Pursuant to CMO 26, Defendants hereby file six motions for summary judgment, one in each of the School District trial bellwether cases.  Defendants provide this "road map" to the Court to assist it in its review of the briefing.

To survive summary judgment, each Plaintiff must demonstrate that there are material disputed issues of fact in its own case and that its claims are legally viable under the laws of the governing state. *See Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) ("Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims.  The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Because the bellwether districts are from six different states and have different witnesses and documentary evidence, Defendants filed six separate motions so that the Court can evaluate each case on its own governing law and factual record.  At the same time, each motion raises the same primary arguments because each case suffers from similar legal and evidentiary failures—Plaintiffs' expert opinions and testimony are largely the same for each district, Plaintiffs' theories of relief are the same, and, in each district, Plaintiffs are unable to provide admissible competent evidence to support their claims. Accordingly, Defendants acknowledge that there is overlap in their arguments across the six briefs.

Defendants have numbered each of the School District motions for summary judgment in the order of the trial sequence (Breathitt, Tucson, Charleston, Irvington, DeKalb, and Harford) and respectfully suggest that it may be most helpful to the Court to read the briefs in that order.  However, other than this explanatory road map which appears only here, the briefs stand alone.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Over the last several years, Breathitt, a small school district in Kentucky, suffered two devastating floods, the COVID-19 pandemic, gross financial mismanagement, and pervasive poverty.  It is beyond dispute that these challenges harmed its students' mental health.  At the same time, Breathitt allowed students to access Defendants' platforms on school campuses and extensively used Defendants' platforms to promote its own activities and connect with the school community.  Nevertheless, Breathitt now claims that it is owed money from Defendants to combat an alleged mental health "crisis" among its students, which it claims is due to students' use of Defendants' platforms.  But in sharp contrast to evidence of harms from flooding, the pandemic, and financial mismanagement, Breathitt does not even have competent evidence showing harms from students' use of Defendants' platforms.  Instead, discovery has shown that Breathitt cannot support its allegations, and summary judgment is warranted on a series of independent grounds.

*First*, Breathitt's claims for nuisance and negligence fail because it has not adduced evidence of causation.  This Court limited the scope of Breathitt's claims at the pleadings stage, holding that Breathitt can predicate claims only on certain actionable conduct—Defendants' use of the features that the Court concluded were not protected by Section 230 or the First Amendment, or Defendants' alleged failure to warn.  By the same token, the Court made clear that Breathitt cannot recover for injuries caused by third-party conduct, third-party content, or protected publishing activities.  But every social-media-related issue Breathitt documented during discovery actually stems from third-party content and conduct, such as bullying and vandalism.  And Breathitt has no admissible evidence that each Defendant's platform(s) caused any mental health issues among any particular students.  Indeed, Breathitt lacks the most basic facts about social media use by its students—it does not know what platforms a given student uses, how frequently its students use Defendants' platforms, what features they use, or what effects those features have on its students.  Rather, Breathitt's evidence relates largely to its students' use of smartphones or "social media" generally.  As a result, Breathitt cannot establish that any one of Defendants' platforms—let alone the at-issue features of those platforms—*caused* its students any harm or that Breathitt incurred expense as a result of that harm.

*Second*, summary judgment is warranted on Breathitt's failure to adduce evidence of damages. Breathitt seeks past damages, primarily for the time its staff purportedly "lost" while addressing social media issues. But Kentucky law squarely holds that this sort of "lost time" analysis is inherently speculative and not compensable as a matter of law. Even if "lost time" were compensable, Breathitt has no competent, contemporaneous evidence proving lost time; it instead presents only retrospective, made-for-litigation affidavits and teacher surveys as "evidence" of its "lost time." Nor has Breathitt presented any competent evidence tying its few claimed out-of-pocket losses for payments to certain vendors and property damage repairs to Defendants' actionable conduct.

*Third,* Breathitt's proposed "abatement" remedy is also improper in form and substance. Breathitt seeks $60 million through a 15-year "strategic plan" to fund mental health programs in schools (irrespective of any connection to Defendants' alleged conduct). But as a threshold matter, Breathitt is not entitled to abatement because it has an adequate remedy at law—*i.e.*, money damages (notwithstanding the fact that Breathitt cannot prove that it should recover such damages). Further, substantively, Breathitt's "strategic plan" does not constitute proper abatement, which requires that the offending party cease *the conduct* causing the alleged nuisance. Breathitt's abatement plan does nothing to address or "abate" Defendants' conduct and therefore fails to constitute abatement. The plan is also not recoverable as "future damages" because it depends entirely on speculative future events and is untethered from the injuries that Breathitt alleges.

*Fourth*, Breathitt has no evidence supporting the critical elements of its failure-to-warn claim. There is no duty for Defendants to warn a district that its students' use of Defendants' platforms may cause the district financial problems. No court has ever held that a company is required to provide a warning to a non-user of a product or service that others' use of that product or service may cause financial injury to the non-user. Breathitt also lacks evidence that it would have behaved differently if a warning had been delivered. Nor can Breathitt assert a claim based on Defendants' alleged failure to provide warnings to third parties such as students and their parents.

*Finally*, the statute of limitations bars Breathitt's claims. The longest possible statute of limitations here is five years. Yet Breathitt says its injuries began—and so the claim accrued—more than five years

before it filed suit. Rather than asserting its rights when these purportedly grievous harms began, Breathitt sat on those rights for years.

## II.    BACKGROUND

### A.    Breathitt County School District

Breathitt is a small school district in Kentucky with four schools, approximately ███████ ████████████████████████████████████. *See* Ex. 1(Breathitt Second Am. Pl. Fact Sheet ("Breathitt Fact Sheet")) ¶¶ 9–11.[1]  Breathitt County suffers from generational poverty. *See* Ex. 2 (Deposition of Kelli Gross ("Gross Dep.")) 40:1–13.  Breathitt has a history of mismanagement: for instance, a 2012 audit found that administrators diverted resources away from student education and to themselves. *See, e.g.,* Ex. 3 (KY-AUDITOR-001-00000001); *see also* Ex. 4 (Rule 30(b)(6) Deposition of Stacy McKnight ("McKnight 30(b)(6) Dep.")) 23:6–44:11.  A ████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████.  *See* Ex. 5 (BREATHITT00349091) at 00349100–00349102; *see also* Ex. 6 (Deposition of Hannah Watts ("H. Watts Dep.")) 52:14–61:18.

Compounding the inadequate support for student mental health by the District, Breathitt's students have faced substantial challenges impacting their mental health and education.  In 2021 and 2022, Breathitt was devastated by flooding that destroyed homes and a school technology center, and Breathitt's witnesses described the severe impact of the flooding on its students' mental health, including because many students lost their homes, were caught in the flood waters, missed school for months, and had no internet access. *See, e.g.,* Ex. 7 (Rule 30(b)(6) Deposition of Kera Howard ("Howard 30(b)(6) Dep.")) 30:11–37:13; *see also* Ex. 8 (April 23, 2025 Deposition of Jeremy Hall ("April 23, 2025 Hall Dep.")) 51:6–54:14.  Likewise, Breathitt's witnesses agreed that the COVID-19 pandemic harmed students' mental health. *See, e.g.,* Ex. 7 (Howard 30(b)(6) Dep.) 13:16–30:10.  Breathitt also has a documented history of in-school violence, such as student fights. *See id.* at 64:6–70:3.

---

[1] All exhibits are to the accompanying Declaration of Ashley M. Simonsen.

## B. Breathitt's Lack of Evidence

Despite knowing that many of these other factors have a significant impact on student mental health, Breathitt has no such understanding of how social media—or, more specifically, Defendants' platforms—may or may not have affected its students. Before filing this case, Breathitt undertook *no* meaningful effort to assess its students' social media use in schools, the impacts of social media use on its students' mental health, or the connection between social media use and its students' education. *See* Ex. 1 (Breathitt Fact Sheet) ¶¶ 47–52 (stating that ███████████████████████████████████████ ████████████████████████████████); *infra* Section IV.A. Even now, Breathitt does not know with any specificity how often its students use social media or which social media platforms its students use—so it does not know whether or how often its students use Facebook, Instagram, YouTube, TikTok, or Snapchat, platforms that have been around for many years. *See* Ex. 7 (Howard 30(b)(6) Dep.) 92:24–93:8, 95:16–20; *see infra* Section IV.A.2. And Breathitt does not know with any specificity how much time Breathitt students spend using Defendants' platforms as opposed to engaging in other activities on their cell phones, such as internet browsing, texting, or playing video games. *See* Ex. 9 (April 22, 2025 Rule 30(b)(6) Deposition of Phillip Watts ("April 22, 2025 P. Watts 30(b)(6) Dep.")) 26:18–32:17; *infra* Section IV.A.2.

Breathitt does not know how often students are disciplined for using smartphones in class, nor how often such violations involve Defendants' platforms. *See* Ex. 10 (Rule 30(b)(6) Deposition of Hannah Watts ("H. Watts 30(b)(6) Dep.")) 18:25–19:25 (Breathitt does not track all cell phone violations in Infinite Campus), 11:11–14:4 (Breathitt does not know the number of cell phone violations involving each Defendant's platform(s)). The same is true for other types of discipline: Breathitt has never analyzed the alleged connection between Defendants' platforms and disciplinary incidents, such as bullying or fighting linked to Defendants' platforms. *See id.* at 12:1–25 (noting that Breathitt does not possess any reports, surveys, analyses, studies, or other documents that describe the prevalence of social media use in the District).

Breathitt likewise lacks sufficient, admissible data on any mental health harms purportedly relating to Defendants' platforms, let alone relating to those platforms' specific actionable features. Breathitt does not know whether *any* student has been diagnosed with a mental health issue linked to social media or

how many mental health harms relate to students' use of Defendants' platforms. Ex. 11 (Deposition of Kera Howard ("Howard Dep.")) 27:7–28:8 (Breathitt's guidance counselors cannot diagnose the cause of students' mental health issues), 35:4–36:24 (Breathitt's behavioral tool, Terrace Metrics, cannot determine whether social media caused students' mental health issues). Breathitt routinely refers students with mental health issues to Kentucky River Community Care for counseling; but none of those referrals *ever* identified "social media addiction" as the cause of any students' mental health issues. *See* Ex. 7 (Howard 30(b)(6) Dep.) 114:3–5, 116:20–23. And, when Breathitt invokes social media-related incidents in this litigation, they concern third-party content or third-party conduct. *See infra* Section IV.A.1.

C.    **Breathitt's Theory of Damages**

Breathitt seeks $2.2 to $3 million in past damages. This figure is not based on an amount of money expended or any similar actual, calculable loss. *See infra* Section IV.B. It is instead primarily based on a loose estimate of how much time its staff "lost" addressing social media issues. *See id.* Breathitt also seeks $62,330 in certain expenses related to vendors and $2,183 in expenses related to property damage.

***"Lost Time" Opportunity Costs.*** The vast majority of Breathitt's alleged damages are for the "opportunity cost" of the time its staff allegedly spent addressing social media-related issues. Despite adducing no competent evidence that Breathitt incurred these costs *as a result* of Defendants' platforms, as opposed to costs it was already required to pay as part of operating schools, Breathitt's evidence for this theory consists of (i) a made-for litigation survey that asked teachers to retrospectively estimate the time they spent on issues relating to social media (including but not limited to Defendants' platforms) over the last eleven years; and (ii) affidavits submitted by Breathitt administrators that purport to estimate the amount of time that certain job positions spent on social media-related concerns over the last decade. *See generally* Ex. 12, Second Amended Report of Bryce Ward ("Second Am. Ward Rep.").

In the survey, 47 teachers answered questions to estimate the number of daily minutes of classroom time they recalled having been "diverted" by social media since 2014. *See* Ex. 13 (Report of Robert Klein ("Klein Rep.")) ¶¶ 40–41, Appendix E. While the survey specifically called out each Defendants' platform(s) as an example of "social media," the survey was not limited to Defendants' platforms; it inquired about "social media" generally and did not ask respondents to limit their estimates to certain features of Defendants' platforms. *Id.* ¶¶ 14, 32–36, 38. Breathitt's expert then calculated the amount of

purportedly lost time as a percentage of teachers' salaries and benefits based on the 47 respondents' answers. Ex. 12 (Second Am. Ward Rep.) ¶¶ 38–40. Based on this method, Breathitt's expert claims the District incurred lost opportunity costs of approximately $2.2 to $3 million, depending on whether benefits are included in the calculation. *Id.* ¶ 45.

Breathitt also submitted five affidavits from administrators, principals, and a guidance counselor that purported to estimate the percentage of time certain non-teacher staff spent "dealing with social media or its impacts" from 2016 to 2025.[2] Ex. 12 (Second Am. Ward Rep. ¶ 41); Ex. 14 (Affidavit of Daphne Noble ¶ 13; Ex. 15 (Affidavit of Phillip Watts) ¶ 13; Ex. 16 (Affidavit of Kera Howard) ¶ 18; Ex. 17 (Affidavit of Jeremy Hall) ¶¶ 13, 17; Ex. 18 (Affidavit of William Noble) ¶ 11. Depending on the particular position and year, Breathitt's affiants estimated that Breathitt staff spent between 5% and 78% of their time "dealing with social media." Ex. 12 (Second Am. Ward Rep.) ¶ 41. However, the estimates did not limit "social media" to actionable conduct or differentiate among particular platforms. *E.g.*, Ex. 19 (July 28, 2025 Deposition of Phillip Watts ("July 28, 2025 P. Watts Dep.")) 42:12–45:17 (80% time estimate includes time spent responding to media or police inquiries, attending routine board meetings, and issuing press releases about facilities projects). The deposed affiants did not consult any documents or conduct any numerical analysis to support their affidavits. *See* Ex. 20 (July 29, 2025 Deposition of Daphne Noble ("July 29, 2025 D. Noble Dep.")) 46:8–47:12; Ex. 21 (July 28, 2025 Deposition of Jeremy Hall ("July 28, 2025 Hall Dep.")) 40:2–41:4, 43:6–16; Ex. 19 (July 28, 2025 P. Watts Dep.) 41:4–46:3; Ex. 22 July 28, 2025 (Deposition of William Noble ("July 28, 2025 W. Noble Dep.")) 20:7–21:5. Instead, the affiants relied solely on their own memories and/or conversations with employees to create their estimates. *See* Ex. 20 (July 29, 2025 D. Noble Dep.) 46:8–47:12; Ex. 21 (July 28, 2025 Hall Dep.) 40:2–41:4, 43:6–16; Ex. 19 (July 28, 2025 P. Watts Dep.) 41:4–17, 43:16–44:4, 45:18–47:5; Ex. 22 (July 28, 2025 W. Noble Dep.) 20:7–21:5.

Breathitt's experts relied entirely on the survey results and these affidavits to calculate Breathitt's alleged "opportunity costs" damages—without independently verifying any of the estimates. Ex. 12

---

[2] The affiants were Daphne Noble (Principal, Breathitt High School), Kera Howard (Guidance Counselor, Breathitt High School), Phillip Watts (Superintendent, Breathitt County Schools), Jeremy Hall (Principal, Sebastian Elementary School), and William Noble (Director of Technology, Breathitt County Schools).

(Second Am. Ward Rep.) ¶ 34. By converting the percentage of purportedly lost time into a percentage of teacher and staff salaries and benefits, Breathitt claims that the District incurred the $2.2 to 3 million in wages and benefits for time diverted because of student social media use. *See id.* ¶ 45.

***Out-of-Pocket Expenditures.*** Breathitt also seeks to recover expenditures it allegedly incurred because of Defendants' platforms. Breathitt's claimed out-of-pocket damages include $2,183 to fix property damage allegedly caused by students who engaged in vandalism after allegedly watching content found on Defendants' platforms. Ex. 23 (Report of Jeffrey Meyers ("Meyers Rep.")) at Appendix C; *see* Ex. 11 (Howard Dep.) 43:5–15. Breathitt's claimed damages also include $62,330 in costs related to cellphone lockers/caddies (Amazon Capital Services and Quill Corporation), E-Hallpass software that tracks students in between classes (Securly, Inc. Eduspire Solutions, LLC), classroom computer monitoring software (Hapara, Inc.), and third-party programming (Remix Education, Kids First, and Millstone Labs, LLC). *See* Ex. 23 (Meyers Rep.) at Appendix C. The contemporaneous documentation for these expenditures does not show any connection to social media or Defendants' platforms. Ex. 4 (McKnight 30(b)(6) Dep.) 126:11–21; 148:7–150:7; 152:11–156:24; 158:25–163:15.

### D.    Breathitt's Proposed "Strategic Plan"

Breathitt also seeks to receive money to fund a *$60 million* "strategic plan" developed by one of its experts, Dr. Sharon Hoover, to "abate" the alleged public nuisance.[3] *See generally* Ex. 25 (Amended Report of Dr. Sharon Hoover ("Am. Hoover Rep.")); *see also* Defendants' Rule 702 Motion to Exclude School District Expert Testimony at III.E (motion to exclude Dr. Hoover's opinions); Defendants' Rule 702 Motion to Exclude General Causation Testimony at II (same). That plan stretches 15 years into the future and seeks to establish a panoply of initiatives at Breathitt addressing, among other things, mental health, student wellbeing, family engagement, digital literacy, and data infrastructure. *See, e.g.*, Ex. 25 (Am. Hoover Rep.) ¶¶ 140–62; *infra* Section IV.C.1.

Breathitt currently has a staff of approximately ███ people. *See* Ex. 1 (Breathitt Fact Sheet) ¶ 11. The strategic plan recommends hiring *46 additional staff*, including psychologists, social workers, and

---

[3] Dr. Hoover offered a nearly identical strategic plan for each bellwether district, with adjustments for the number of recommended personnel.

8

even IT staff. Ex. 25 (Am. Hoover Rep.) ¶ 107. The plan would also create numerous new positions, such as three "digital literacy specialists," four "life skills specialists," four "family engagement coordinators," and three "school-based mental health clinicians." *Id.* If hired, these and the other recommended professionals would serve all students—including some prospective students who have not yet been born—not just those students who use Defendants' platforms or certain features of the platforms. Ex. 26, August 12, 2025 Deposition of Dr. Sharon Hoover ("August 12, 2025 Hoover Dep.") 300:19–303:1; Ex. 27, August 13, 2025 Deposition of Sharon Hoover ("August 13, 2025 Hoover Dep") 622:22–624:21, 802:18–804:1. The strategic plan recommends implementing numerous initiatives to address student mental health and digital literacy, such as a new data infrastructure system to purportedly assist schools in identifying students with social-media-related health concerns, increased mental health literacy and life skills programming to help students manage their online activities and their *offline* relationships, and school culture and community building initiatives, such as clubs, community events, and parent education efforts. *See* Ex. 25 (Am. Hoover Rep.) ¶¶ 67–77, 137.

The plan does not mention Defendants' platforms at all or make any recommendations regarding changes to the operation of any platform. *See generally* Ex. 25 (Am. Hoover Rep.). The plan does not account for any changes to Defendants' platform that might occur over the plan's 15-year timeline, such as changes to or removal of the features responsible for the alleged harm. Ex. 26 (August 12, 2025 Hoover Dep.) 308:19–20 ("I haven't studied the changes on the social media platforms"); Ex. 27 (August 13, 2025 Hoover Dep.) 526:1–526:3 ("I don't think I'm offering an opinion that the social media companies change their design."). Nor does the plan consider potential changes in how students might use Defendants' platforms over the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely. *Id.* at 803:10–20 ("it would be hard for me to predict" whether adolescents will still be using social media 10 years from now), 803:21–804:1 (Hoover has not studied anticipated changes in how students use social media).

### E.    The Court's Motion-to-Dismiss Ruling

At the motion-to-dismiss stage, the Court recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected publishing activities. Order Grant. in Part and Den. in Part

9

Defs.' Mot. Dismiss the School District and Local Government Entities' Master Compl. ("SD Order") (ECF 1267) at 2.  The Court similarly held that Defendants could not be held liable for non-foreseeable third-party conduct, absent some narrow exceptions for conduct promoted by Defendants.  *Id.* at 25.  The Court permitted Breathitt to proceed on its "core theory" that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources."  *Id.* at 26.  At the same time, the Court made clear that the case must focus on "the specific conduct through which the defendants allegedly violated their duties to plaintiffs"—i.e., Defendants' use of the limited set of at-issue features that the Court has held are not barred by Section 230 and the First Amendment.  Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("PI Order") (ECF 430) at 14; *see* SD Order at 12–13 (applying analysis to school district claims).

Specifically, the Court permitted Breathitt to proceed insofar as its claims were based on Defendants' use of certain features—*i.e.*, Defendants' alleged

- failure to implement robust age verification processes to determine users' ages;
- failure to implement effective parental controls;
- failure to implement effective parental notifications;
- failure to implement opt-in restrictions to the length and frequency of use sessions;
- creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;
- failure to label content that has been edited, such as by applying a filter;
- making filters available to users so they can, among other things, manipulate their appearance; and
- failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

SD Order at 12–13 (hereinafter, the "at-issue features").[4]  By contrast, the Court held that Plaintiffs could *not* base their claims on any of the following features:

---

[4] The SD Order included the "failure to enable default protective limits to the length and frequency of use sessions" as a feature that was not barred.  SD Order at 14.  But the Court explained in its order addressing Section 230 that claims based on this alleged failure were barred because it "would inherently limit what defendants are able to publish."  PI Order at 16.

- use of algorithms to promote [purportedly] addictive engagement;
- failing to institute blocks to use during certain times of day (such as during school hours or late at night);
- not providing a beginning and end to a user's "Feed";
- publishing geolocating information for minors;
- recommending minor accounts to adult strangers;
- limiting content to short-form and ephemeral content, and allowing private content;
- timing and clustering of notifications of *third-party* content in a way that promotes addiction; and
- timing and clustering of notifications of *defendants'* content to increase addictive use.

SD Order at 14. The Court also declined "at [the motion to dismiss] stage . . . to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general." *Id.* at 45. Accordingly, as used in this memorandum, Defendant's "actionable conduct" consists of (1) Defendants' use of the at-issue features and (2) Defendants' alleged failure to warn.

## III.    LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims." *Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The evidence presented by the parties must be admissible. Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## IV.     ARGUMENT

### A.     Breathitt Lacks Competent Evidence of Causation.

Rejecting an "all or nothing" approach, this Court has made clear that in order to prove causation Breathitt must connect Defendants' *actionable conduct*—as opposed to social media or electronic device use generally, third-party content, third-party conduct, or Defendants' protected publishing activities—to its alleged injuries. *See* PI Order at 14; SD Order at 12–13. Despite the sweeping allegations in the Master Complaint, Breathitt lacks *evidence* that any Defendant's actionable conduct caused it injury.

To succeed on its negligence claim, Breathitt must prove both causation in fact and proximate causation. Causation in fact requires "the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred 'but for' the defendant's negligent or wrongful conduct in breach of a duty." *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. 2016) (internal citations omitted). The "but for" cause must be a "substantial factor" in causing the harm. *Id.* Under Kentucky law, even when but-for causation is proven, causes that are too "attenuated" are not proximate causes and cannot lead to liability. *Id.* at 731. Thus, to survive summary judgment on its negligence claim in light of the "conduct-specific, feature-by-feature assessment" required by the Court, Breathitt must come forward with evidence showing that each Defendant's actionable conduct directly caused Breathitt to incur expenditures. *See* SD Order at 12.

On the public nuisance claim, too, Breathitt must prove both causation-in-fact and proximate causation. *See Commonwealth v. S. Covington & C. St. Ry. Co.*, 181 Ky. 459, 205 S.W. 581, 583 (1918) ("The injurious consequences or nuisance complained of should be the natural, direct, and proximate cause of defendant's acts to render him liable for maintaining a public nuisance." (cleaned up)). A public nuisance involves a "significant" and "unreasonable" interference with a public right. *See Roberie v. VonBokern*, 2006 WL 2454647, at *3 (Ky. Aug. 24, 2006); Restatement (Second) of Torts § 821B (1979). Thus, to survive summary judgment on its nuisance claim, Breathitt must come forward with evidence that each Defendant's actionable conduct was a direct cause of a *significant* interference with a public right—here, the public right to health.

Now, after discovery has been completed, the record is clear that Breathitt in fact has *no* admissible evidence sufficient to prove that it was injured as a result of actionable conduct by Defendants. *First*,

Breathitt has no sufficient evidence that it was harmed as a result of the at-issue features or any alleged failure to warn. Tellingly, the at-issue features are primarily features that users or their parents can choose to use or not use, such as parental controls, parental notifications, time limits, account deactivation, or CSAM reporting. Breathitt has adduced no evidence that giving parents or users additional controls would have any meaningful impact on it. Rather, Breathitt's limited evidence of specific harms allegedly caused by Defendants' platforms points directly to third-party content: Breathitt's witnesses have consistently and expressly testified that specific allegedly harmful disruptions in schools occurred as a result of the publication of harmful content on Defendants' platforms. Any claims based on such harms are barred by Section 230 and the First Amendment and thus are not actionable.

*Second*, setting aside instances related to third-party content, Breathitt has no admissible evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses. Indeed, Breathitt lacks even basic information about the extent or nature of its students' use of Defendants' platforms or about students' mental health. While Breathitt may gesture toward fact or expert testimony about "social media" or cellphone use generally, such evidence is insufficient to meet its burden to show that *each* Defendant's *actionable* conduct caused it injuries. For these reasons, summary judgment on causation grounds is warranted. *See Patton*, 529 S.W.3d at 731 ("proximate causation is regarded as an issue of law to be decided by the courts"); *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) ("Summary judgment in a negligence action is appropriate if the record does not support . . . proximate cause."); *see also* SD Order at 21–22 ("where the existence of proximate cause turns not on a question of fact but on whether the facts alleged are capable of establishing proximate cause, the issue is a matter of law resolvable" by the court).

### 1.    Breathitt's Allegations of Specific Harms All Impermissibly Rely on Third Party Content and Protected Publishing Activities.

The Court has made clear that liability in this case cannot arise from the (i) "mere publication of . . . content" or (ii) features that the Court held are protected by Section 203 or the First Amendment. SD Order at 25. It has likewise made clear that "non-foreseeable third-party conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms— "cannot be attribut[ed] to defendants." *Id.* at 25–26. Thus, to satisfy its burden on summary judgment,

13

Breathitt must come forward with competent evidence sufficient to prove that Defendants' *actionable conduct*—as opposed to content, protected features, or third-party bad acts—caused it harm. It has not.

Breathitt has no competent evidence sufficient to show that it was harmed as a result of the at-issue features or any failure to warn. For example, Breathitt has no specific, admissible evidence regarding the number of its students (if any) who used Defendants' platforms prior to age 13. Thus, it is unsurprising that Breathitt lacks evidence that Defendants' alleged failure to implement "robust" age verification processes caused it to incur expenses. Breathitt also has no specific, admissible evidence that giving users platform-level tools to set their own voluntary time limits (above and beyond the controls already available on the users' devices) or changing the processes for account deactivation would have meaningfully reduced the use of any platform by Breathitt's students, let alone that any such reduction would have led to Breathitt incurring fewer expenses. Breathitt similarly lacks specific, admissible evidence that it incurred expenses as a result of Defendants' alleged failure to implement effective parental controls or notifications as it has no evidence of how many parents already use parental controls or how many would use different parental controls had they been implemented. The same holds true for each of the "at-issue" features.[5]

Instead, the only *specific* evidence of harm that Breathitt has proffered is of harm caused by third-party bad acts and protected publishing activities on Defendants' platforms—precisely the type of conduct the Court has found is not actionable. For example, Breathitt has relied almost entirely on a made-for-litigation, after-the-fact, informal poll of its counselors in an attempt to establish that social media use has negatively affected its students' mental health. *See* Ex. 7 (Howard 30(b)(6) Dep.) 103:11–105:16 (testimony of 30(b)(6) representative regarding survey Breathitt conducted in order to complete plaintiff fact sheet). Breathitt estimated based on that survey that 200 to 220 students "have been seen due to issues explicitly relating to social media." *Id.* at 104:1–5. But Breathitt's corporate representative, Kera Howard—a counselor at Breathitt's only high school—testified unequivocally that *all* of those incidents were directly related to *harmful content posted by third parties*. Specifically, Breathitt identified "what

---

[5] Nor has Breathitt presented competent evidence of what any warning should have looked like or that such a warning would have made a difference to Breathitt's alleged harms. *See infra* Section IV.A.

another kid is saying" or "spread[ing]" about a student, the posting of "nude" or "inappropriate pictures," a "gay pride poster," a "trust[/]do not trust list," "videos of fight[s]," "threats," and "cyberbullying" as a "complete list" of the "social media-related issues" for which "Breathitt has seen students." *Id.* at 105:17–113:13. Ms. Howard reaffirmed this position in her fact deposition, estimating that *95 to 98 percent of the issues* she sees relating to social media *relate to harmful content* (and that the remaining incidents relate to viral challenges, *see infra*). Ex. 11 (Howard Dep.) 44:15–45:6; *see also* Ex. 7 (Howard 30(b)(6) Dep.) 110:24–113:13.[6]

There is no dispute that such content on Defendants' platforms was posted by third parties. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (user comments and posts are "prototypical" user-provided content within the scope of Section 230). Defendants' publication of that content falls squarely within the heartland of conduct protected by Section 230, is not actionable, and cannot be used to establish that Defendants caused harm to Breathitt. PI Order at 14–19; *see also, e.g.*, *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1172, 1182 (9th Cir. 2024) (Section 230 protects publishers of "harassing and bullying speech").

While recognizing that "mere publication of third-party content" cannot form the basis of liability under Section 230, the Court carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" through "conduct like providing cash prizes to challenge participants." SD Order at 25 (quotation marks omitted). Breathitt, however, has no evidence that any Defendant itself provided cash prizes to any participant in a dangerous challenge, created filters that facilitated dangerous challenges, or otherwise "promoted, developed, or participated in a foreseeably dangerous challenge" that caused Breathitt harm beyond the Defendant's mere "algorithmic publication, curation, or amplification" of the challenge. *Id*. at 26. Defendants are therefore entitled to summary judgment regarding challenges. *Id*. at 26.

---

[6] Other witnesses recounted similar issues: all related to student bullying, Ex. 21 (July 28, 2025 Hall Dep.) 29:5–31:9; inappropriate student comments on social media, *id*. at 29:16–19; Ex. 20 (July 29, 2025 D. Noble Dep.) 38:16–24; inappropriate images posted of classmates, Ex. 21 (July 28, 2025 Hall Dep.) 29:16–19; prank videos, *id*. at 35:5–10; on-campus fight videos, *id*. at 34:25–35:4, Ex. 19 (July 28, 2025 P. Watts Dep.) 39:13–16; comments on school press releases, *id*. at 43:11–44:17; and the destruction of school bathrooms by students, Ex. 20 (July 29, 2025 D. Noble Dep.) 40:9–20.

Similarly, the Court recognized that liability might arise as a result of a filter created by a Defendant itself. *Id.* at 25. But Breathitt has no competent evidence that it suffered any harm as a result of filters—let alone a filter created by a Defendant. Summary judgment on filters is thus also warranted.

In short, because Breathitt cannot connect *Defendants' actionable conduct*—as opposed to third-party wrongdoing or the publication of content—to its alleged injuries, Defendants are entitled to summary judgment. *See, e.g.*, *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (allowing claim to proceed where alleged duty violated was "*fully independent of* [Defendants'] role in monitoring or publishing third-party content" (emphasis added)); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (CDA bars "state tort claims [that] are inextricably intertwined with [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com*, LLC, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024) (granting summary judgment where claim "intertwined" with conduct protected by Section 230); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors."); *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (granting summary judgment where "theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events").

## 2. Breathitt Has No Competent Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform.

Breathitt's "core theory" of injury—and the basis on which the Court permitted it proceed at the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources." SD Order at 26. Setting aside alleged incidents involving third party content and wrongdoing, however, the record is clear that Breathitt has no competent evidence that it was injured as a result of its students' "compulsive use" of each Defendant's specific platform(s). While Breathitt points to generalized testimony regarding harms from "social media" use or smartphone use generally, that

testimony cannot meet Breathitt's burden to show that it was injured by each Defendant's specific platform(s)—let alone each Defendant's actionable conduct.

As a threshold matter, and as explained in Defendants' Rule 702 motion on general causation, the scientific evidence actually does *not* support the theory that Defendants' platforms can cause the types of mental health harms alleged. Because Breathitt cannot establish general causation, Defendants are entitled to summary judgment. *See, e.g.*, *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) ("General causation [is an] essential element[] of Plaintiffs' prima facie case . . . . Expert testimony is necessary to make this showing" and because the Court excluded all general causation opinions under Rule 702, "Defendant's motions for summary judgment must be and are GRANTED." (citations omitted)).

Even setting that foundational defect aside, Breathitt cannot establish that each Defendant's specific platform(s)—or even all of the Defendants' platforms combined—caused it harm. "To prove liability, [a plaintiff] must show that *each defendant* both violated the standard of care and that the violation caused [the plaintiff's] injuries." *Mullins v. Appalachian Regional Healthcare, Inc.*, 707 S.W.3d 1, 8 (Ky. Ct. App. 2025) (emphasis in original) (granting summary judgment in medical malpractice case to most defendants because plaintiff failed to present expert evidence that each of those defendants caused plaintiff's injury). Thus, "in order to survive a summary judgment motion by each defendant, [a plaintiff] had to disclose [evidence] that was specific to each defendant." *Id.*

Breathitt has no such Defendant-specific evidence. It lacks competent evidence that any student, much less a significant number of students, has used one or more of Defendants' platforms in a way that harmed the student's mental health. Indeed, Breathitt lacks even basic information about the extent or nature of its students' use of Defendants' platforms. It does not know the answer to key threshold questions, including how many of its students used Facebook, Instagram, YouTube, TikTok, or Snapchat; how often they used them; when they used them; for how long they used them; or which features of the platforms they used. *See* Ex. 7 (Howard 30(b)(6) Dep.) 92:20–93:8, 94:18–95:1, 95:16–20 (Breathitt's 30(b)(6) representative admitting this); Ex. 8 (April 23, 2025 Hall Dep.) 82:24–87:1 (admitting that he has no data regarding what students do on their personal devices); Ex. 6 (H. Watts Dep.) 39:10–12 (testifying that she does not know which social media sites, if any, her students use).

Breathitt also cannot differentiate student use of technology from use of Defendants' platforms. Breathitt has no data regarding students' use of any given Defendants' platform(s) as opposed to other social media platforms, gaming platforms, or the myriad other apps one can access on a smartphone, such as internet browsing or text messaging. *See* Ex. 9 (April 22, 2025 P. Watts 30(b)(6) Dep.) 73:19–74:3 (admitting that Breathitt has no data to show that social media is the problem during instructional time as opposed to other cellphone use); Ex. 7 (Howard 30(b)(6) Dep.) 92:24–93:14. And Breathitt's 30(b)(6) representative acknowledged that Breathitt is unaware of any student who has been referred to outside mental health care providers for social media addiction, much less addiction to any Defendant's platform. *See, e.g., id.* at 116:20–117:6. Accordingly, Breathitt could not possibly show the predicate of its claims— that actionable conduct on the part of each Defendant (or even of Defendants as a whole) led to compulsive use of that Defendant's platform(s) by Breathitt students, which in turn caused Breathitt to incur expense.

Breathitt has only ever put forward one piece of documentary evidence purportedly showing that its students compulsively use Defendants' platforms: the 2021 KIP Survey. *E.g.*, Ex. 28 (BREATHITT00151339); Ex. 7 (Howard 30(b)(6) Dep.) 92:11–19. But the 2021 KIP Survey does *not* establish how frequently students used each Defendant's platform(s). Instead, the survey asked only about online platform use broadly—including platforms such as Twitter and online gaming platforms that have nothing to do with Defendants. *See* Ex. 7 (Howard 30(b)(6) Dep.) 93:15–94:8, 95:8–11; *see also* Ex. 28 (BREATHITT00151339) at 00151372 (███████████████████████████████████████ ████████████████████████████████████████). A single 2021 snapshot survey about online activity cannot prove compulsive use of any of the five specific platforms at issue in this litigation or harm resulting from that use—particularly given that Breathitt seeks damages for conduct dating back to 2015.[7]

---

[7] Nor can the KIP survey show that any Breathitt students suffered mental health harms from social media; the only question in the survey that was even remotely related to mental health was a vague reference to how social media made students "feel," to which the majority of students responded that it made them feel *better*. Ex. 7 (Howard 30(b)(6) Dep.) 98:12–18, 99:10–100:19. The after-the-fact survey of Breathitt's counselors discussed above is likewise generically about "social media use," not any Defendant's platform(s).

Breathitt's experts likewise fail to link Breathitt's alleged injuries to actionable conduct by each specific Defendant. For example, Dr. Sharon Hoover impermissibly groups together all "social media" platforms—including those not at issue. *See generally* Ex. 25 (Am. Hoover Rep). At no point in her report does Dr. Hoover define "social media," and she certainly does not define it to include only the five platforms at issue, let alone separate out those platforms. Dr. Hoover conceded in her deposition that her causation analysis and opinions are not specific to any platform. *See* Ex. 26 (August 12, 2025 Hoover Dep.) 154:9–13 ("I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera. So I didn't think about it that way."), 262:18–22 (admitting she did not perform a causation analysis for any individual platform).

In short, Breathitt has no competent evidence that each Defendant's specific platform(s) in fact caused (or are even capable of causing) compulsive use on the part of its students, let alone that such compulsive use caused Breathitt to incur expenditures.

\*    \*    \*

Importantly, Breathitt's failure to present evidence regarding each Defendant's platform(s) is compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms or Defendants' alleged failure to warn. *See supra* Section IV.A.1. At bottom, Breathitt is required to come forward with evidence that each Defendant's actionable conduct caused it to incur injury. This requires it to disentangle both (1) alleged harms flowing from online activity that does not involve a given Defendant and (2) alleged harms flowing from third party content and protected publishing activity accessed by students on each Defendant's platform(s). But Breathitt and its experts have done neither, instead focusing broadly on social media use. *See generally* Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony, Section III.A. Accordingly, even if Breathitt's experts were correct that Breathitt has experienced harm as a result of "social media" generally, their opinions do nothing to establish that Breathitt has experienced harm arising specifically from each Defendant's actionable conduct—*i.e.*, excluding third party wrongdoing, content published on Defendants' (and others') platforms, and the protected features of Defendants' platforms. That wholesale failure is fatal on summary judgment. *See* PI Order at 14–19; *see, e.g.*, *Mullins*, 707 S.W.3d at 8; *see also Nuveen Mun. High Income*

*Opportunity Fund*, 730 F.3d at 1123; *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d at 1132; *Backpage.com*, LLC, 724 F. Supp. 3d at 885.

### B.    Breathitt Cannot Show It Is Entitled to Past Damages.

Under Kentucky law, Breathitt must establish that any damages it seeks are "reasonably certain" to be incurred as the "direct and proximate result" of the challenged conduct.  *Harris v. Jiangsu ASG Earth Env't Prot. Sci. & Tech. Co., Ltd.*, 2017 WL 2990279, at *2 (E.D. Ky. July 13, 2017) (quoting *Duty v. U.S. Dep't of Interior*, 735 F.2d 1012, 1014 (6th Cir. 1984)); *see also, e.g.*, *Broyles v. Maudilio*, 2021 WL 5988272, at *1 (W.D. Ky. Oct. 21, 2021) ("A court will not simply accept a plaintiff's statement of damages but must conduct an inquiry to ascertain the amount of damages with reasonable certainty." (cleaned up)).  In holding that the SD Plaintiffs' claims were not improperly derivative of their students' alleged harms, the Court found that they had adequately alleged the following injuries that were unique to them: "diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage."  SD Order at 19–20.

Breathitt has put forward no competent evidence establishing with reasonable certainty past, non-derivative damages resulting from Defendants' actionable conduct.  *First*, Breathitt has no competent evidence that it diverted any financial resources as a result of Defendants' actionable conduct.  While it relies on its expert's calculation of damages relating to alleged "*lost time*"—estimates related to the percentage of time that Breathitt teachers purportedly had to spend addressing issues related to "social media"—such costs (i) are not recoverable under Kentucky law and (ii) are not tied to Defendants' actionable conduct.  *Second*, Breathitt has no competent evidence that it hired new mental health personnel, developed new mental health resources, or implemented other new resources as a result of Defendants' actionable conduct.  *Third*, Breathitt cannot recover for repairing property damage because the evidence is undisputed that the damage resulted from third-party acts, which under this Court's prior ruling cannot form the basis of liability.

### 1.    Breathitt Cannot Show Defendants Caused It to Divert Financial Resources.

Breathitt does not claim that it had to hire any additional staff or pay them more because of Defendants' actionable conduct. Instead, Breathitt advances a theory that its staff has spent *time* addressing social media issues, and that it should be compensated for this "lost" time. But Kentucky law is clear that lost time is too speculative a measure of damages to be recoverable, *see Gassaway Constr. Co. v. Gentry*, 264 S.W.2d 658, 659 (Ky. 1954) (no recovery for lost time absent loss of specific earnings), and in any event Breathitt has not supported these claimed damages with competent evidence.

### a)    Breathitt cannot recover "lost time" damages.

"A general goal of compensatory damages in tort cases is to put the victim in the same position he would have been prior to the injury or make him whole to the extent that it is possible to measure his injury in terms of money." *Schwartz v. Hasty*, 175 S.W.3d 621, 625 (Ky. Ct. App. 2005). Accordingly, Kentucky courts evaluating claims about "lost time" have required that the plaintiff show a loss in the form of lost income or earnings. *See, e.g.*, *Gassaway,* 264 S.W.2d at 659 ("While it is true there was some evidence on [a lost time] theory of damage, such evidence was sparse and only indicated a temporary loss of time and *failed to show any loss of specific earnings* as a result of her injury." (emphasis added)); *Hellmueller Baking Co. v. Risen*, 295 Ky. 273, 174 S.W.3d 134, 137 (1943) (approving jury instruction that "loss of time" was permitted "only" where the plaintiff showed that the injury was "depriving him of *earning capacity*" (emphasis added)). And so, as a district court surveying Kentucky law has held, "lost time" is not compensable beyond lost income or earnings. *See In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 314–15 (S.D.N.Y. 2018).

Yet Breathitt seeks precisely that: "lost time" of its staff unmoored from any actual monetary loss. The way that Breathitt purports to calculate its "lost time" damages illustrates precisely why courts have held that such damages are too speculative to be recoverable. Breathitt's experts invited all of Breathitt's current middle school and high school teachers (70 total) to respond to a survey that asked each survey taker to provide their own unverified estimates of how much time the teacher remembers spending addressing distractions due to social media over the *past decade* (back to 2015). *See* Ex. 13 (Klein Rep.) ¶¶ 19–39. The survey gave recent memory no greater weight than a teacher's recollection of their classroom practices ten years earlier and failed to include any safeguards against responses based upon

faulty or self-serving memory. Breathitt's experts then took the unverified responses of 47 unnamed teachers, calculated the percentage of instruction time purportedly spent addressing social media, and multiplied that percentage against the wages and benefits of all middle and high school teachers within the Breathitt school district to come to a sum of $2.2–3 million. *Id.* ¶¶ 40–43; *see* Ex. 12 (Second Am. Ward Rep.) ¶¶ 35–40, 45.

Breathitt has no evidence that this potential $3 million constitutes an actual monetary loss. Breathitt did not spend $2.2 or $3 million as a result of "lost" teacher time due to Defendants' platforms and it did not hire any new teachers or pay any teachers additional wages or benefits as a result of Defendants' actionable conduct. While Breathitt tries to claim it lost a percentage of its staff time, its own expert admitted that the money it pays teachers in salary and benefits is not dependent on how time is spent performing their duties, and it would have paid that same amount in wages and benefits to its teachers even if Defendants' platforms did not exist at all, or if fewer of its students used Defendants' platforms. *See* Ex. 29 (Deposition of Bryce Ward ("Ward Dep.")) 165:21–166:2, 166:23–167:6, 168:1–11 (Plaintiffs' damages expert agreeing he is not "opining that because of Defendants' platforms specifically any school district had to pay teachers more than they would have paid teachers if Defendants' platforms did not exist"). Because the entire claimed amount is money that Breathitt would have spent on teacher wages and benefits in any case regardless of whether its students even used Defendants' platforms, this just the type of "lost time" theory that Kentucky law—like the law in the overwhelming majority of states—rejects. *See In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. at 314–15.

### b)    Breathitt has no competent evidence establishing these "lost time" damages.

Even if Kentucky law permitted recovery of nebulous "lost time" damages like these, Breathitt cannot meet its burden to prove those damages—let alone with "reasonable certainty." *Broyles*, 2021 WL 5988272, at *1. During fact discovery, Breathitt did not produce any documentary or contemporaneous evidence supporting its claims of lost time, and Breathitt's own personnel readily admitted that they do not keep track of the time spent addressing specific activities. *See* Ex. 20 (July 29, 2025 D. Noble Dep.) 46:8–47:12 (admitting she does not record her time spent on "specific things"); Ex. 21 (July 28, 2025 Hall Dep.) 40:2–41:4, 43:6–16 (admitting he has no records of how he spends his time); Ex. 19 (July 28, 2025

P. Watts Dep.) 45:18–47:5 (acknowledging that he records only his start and stop time and nothing else). At most, deposition and affidavit testimony regarding lost time contains vague, anecdotal, post hoc, non-specific references to time spent attending to purported disruptions due to social media generally (*i.e.*, not specifically as to any Defendants' actionable conduct)—typically in the form of hearsay statements by individuals lacking personal knowledge.[8]

Breathitt's attempt to patch this hole through expert testimony is unavailing. "If the facts in the record contradict an expert opinion, the opinion, although it may be admissible, cannot be relied upon to defeat summary judgment." *Edwards Lifesciences Corp. v. St. Jude Med. Inc.*, 2004 WL 5642457, *5n.5 (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995)); *accord Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). For the reasons explained in Defendants' Rule 702 motion, the Klein survey (and the damages report based on that survey) is unreliable and inadmissible: The use of a retrospective survey to purportedly measure—down to the minute—the amount of time that teachers purportedly spent dealing with social-media related "distraction" for periods of up to a decade or longer is not a reliable methodology. *See* Defendants' Rule 702 Motion to Exclude Testimony of School District Experts at III.B. And Breathitt's expert did nothing to test or ensure that the answers of the percentage of teachers who responded to the survey could be reliably extrapolated and applied to the other teachers who declined to participate. Breathitt has thus failed to establish with "reasonable certainty" its estimate of lost time damages.

---

[8] For example, in his affidavit, William Noble (Technology Director) estimated that his staff spent up to 15 percent of their time in 2025 addressing social media issues. *See* Ex. 18 (Affidavit of William Noble) ¶ 11. But at his deposition, Mr. Noble testified that the statements in his affidavit come from conversations he had a few months ago, of which he cannot remember the specifics including to whom he spoke. *See* Ex. 22 (July 28, 2025 W. Noble Dep.) 32:1–33:7. Mr. Noble also readily admitted that his team does not have documentation supporting the hours allegedly spent on social media in his affidavit. *See id*. at 20:7–21:5; Fed. R. Evid. 602, 801; *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (excluding an affidavit based on inadmissible hearsay where it relied on statements from third-parties). Even if the Court credited this statement, it does not establish the amount of time purportedly lost with reasonable certainty.

Breathitt's lost time estimates also suffer from another independently fatal flaw: the survey questions ask only about time spent dealing with "social media" generally. The questions specifically mention each Defendants platform(s) as an example of "social media," but the survey was not limited to platforms operated by the four Defendants in this case, let alone specific to any one of Defendants' platforms as would be necessary to recover damages against them. *See Mullins*, 707 S.W.3d at 8 (requiring proof that "each defendant" is liable). And the survey made no effort to distinguish between time spent dealing with issues arising from the at-issue features, as opposed to issues arising from, for example, third-party content posted on Defendants' (or other) platforms. Accordingly, the "lost time" estimates are plainly not estimates of time spent addressing Defendants' actionable conduct.

Because there is no competent evidence that Breathitt diverted financial resources as a result of Defendant's actionable conduct, Breathitt failed to meet its burden and summary judgment is warranted. *See Harris*, 2017 WL 2990279, at *2; *Broyles*, 2021 WL 5988272, at *1.

### 2. Breathitt Has No Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms.

Breathitt fares no better in its attempt to justify its damages for alleged out-of-pocket costs—*i.e.* new mental health personnel or third-party vendor costs. There is no evidence that any of these costs were the result of Defendants' actionable conduct.

#### a) Breathitt has no evidence it hired new mental health personnel because of Defendants' platforms.

Breathitt vaguely claims that it has hired new mental health personnel as a result of Defendants' actionable conduct, Ex. 1 (Breathitt Fact Sheet) ¶ 22 (stating Breathitt ███████ ████████████████████████████████████████████), but has identified no evidence to support that claim. *See, e.g.*, Ex. 4 (McKnight 30(b)(6) Dep.) 122:21–126:10 (explaining that Breathitt hired a guidance counselor to help students with social and mental health issues generally, not social media specifically). As a result, Breathitt cannot show any basis for recovering this category of damages.

### b)    Breathitt has no evidence it implemented new programs because of Defendants' platforms.

Breathitt seeks past damages relating to out-of-pocket costs for third party vendors totaling $64,514.  *See* Ex. 23 (Meyers Rep.) at Appendix C.  This includes costs related to cellphone lockers/caddies (Amazon Capital Services and Quill Corporation), E-Hallpass software that tracks students in between classes (Securly, Inc., Eduspire Solutions, LLC), classroom computer monitoring software (Hapara, Inc.) and third-party programming (Remix Education, Kids First, and Millstone Labs, LLC). *Id.*  But Breathitt's effort to saddle Defendants with these costs fail for three reasons.

*First*, Breathitt has not shown that these expenses were triggered by students' use of Defendants' platforms, as opposed to their phones generally.  Breathitt purchased smartphone lockers/caddies to keep students from accessing their *smartphones generally*, not to keep them from accessing *Defendants' platforms specifically or solely*.  *See* Ex. 4 (McKnight 30(b)(6) Dep.) 158:25–161:7.  Breathitt's efforts to prevent students from making phone calls, sending text messages, playing videogames, using *other* social media platforms, or searching the internet, for instance, are not attributable to Defendants.  Likewise, Breathitt's E-Hallpass software and Hapara classroom monitoring systems do far more than just address platforms at issue in this litigation.  As Breathitt's corporate representative testified, E-Hallpass is not specific to social media but instead tracks students as they go to the bathroom or use the hallways during class.  *Id.* at 161:8–162:21.  Hapara is a program that monitors student use of restricted websites anywhere on the internet, including non-social media such as video games, gambling websites, and pornography.  *Id.* at 148:16–149:14.  Breathitt, for example, has made no effort to determine how much Hapara is used for restricting social media specifically.  *Id.* at 149:23–150:2.  And Breathitt's witnesses admitted that it may still use the software even if social media did not exist.  *Id.* at 150:3–7.  Indeed, Plaintiffs' "out-of-pocket damages" expert, Jeffrey Meyers, admits that he "ha[s] no way of knowing" whether "'in the absence of [D]efendants' at-issue conduct" any district's internet content filter costs "would have been the same or less or more."  Ex. 30 (Deposition of Jeffrey Meyers ("Meyers Dep.")) 270:8–17.

*Second*, Breathitt makes no showing that these costs were incurred as a result of *Defendants' actionable conduct*.  Instead, Breathitt's claimed damages relate to costs allegedly incurred in dealing with "social media" or third-party content generally.  As explained above, however, liability may *not* be based

on harms flowing from content published on Defendants' platforms, third-party wrongdoing, or Defendants' protected publishing activities. *See supra* Section IV.A.1. With respect to third-party programming like Remix Education, for example, Breathitt confirmed that these expenses were related to bullying or cyberbullying programs—third-party content and wrongdoing for which Defendants are not liable. *See* Ex. 4 (McKnight 30(b)(6) Dep.) 153:24–156:24; *see also* Ex. 19 (July 28, 2025 P. Watts Dep.) 20:21–21:4 (stating Kids First covered cyberbullying and vaping), 30:21–31:10 (stating Millstone Labs, LLC's programming is related to cyberbullying that occurs both on and off of social media and cyber safety).

*Third,* Breathitt's evidence makes it impossible to calculate the amount of the loss caused by Defendants' actionable conduct with any reasonable certainty. Breathitt does not track costs incurred as a result of social media generally, let alone the aspects of each Defendant's platform that the Court deemed actionable here.[9] Nor did Breathitt take any actions to separately track expenditures as attributable to cellphone use generally, social media writ large, or Defendants' platforms specifically as those expenditures occurred. Ex. 4 (McKnight 30(b)(6) Dep.) 126:11–21. This lack of specificity is particularly problematic given the undisputed evidence that Breathitt often incurs costs in an attempt to curb its students' interaction with their smartphones generally. *See supra* Section IV.B.2. Breathitt has therefore provided no competent evidence to allow a factfinder to apportion costs appropriately or to calculate damages with reasonable certainty.

---

[9] Breathitt seeks to recover various percentages of its out-of-pocket costs purportedly attributable to social media generally. Breathitt chose these allocation percentages based solely on the affidavits of Phillip Watts and William Noble. *See* Ex. 23 (Meyers Rep.) ¶¶ 21–22; Ex. 15 (Affidavit of Phillip Watts) ¶ 9; Ex. 18 (Affidavit of William Noble) ¶¶ 10–11. But Mr. Watts's assignment of percentages was based solely on conversations between him and Breathitt's attorneys. *See* Ex. 19 (July 28, 2025 P. Watts Dep.) 12:8–18, 20:7–12. Mr. Noble similarly testified that his percentages were based on conversations with unnamed individuals of which he could not recall the details. *See* Ex. 22 (July 28, 2025 W. Noble Dep.) 32:1–33:7. Neither Mr. Watts nor Mr. Noble based these percentages on any documentation, data, or programming. *See* Ex. 19 (July 28, 2025 P. Watts Dep.) 19:14–20:20, 26:21–23, 27:22–28:25, 30:14–20; Ex. 22 (July 28, 2025 W. Noble Dep.) 20:7–21:12. Both statements should accordingly be excluded as hearsay.

**3.      Breathitt Cannot Recover Property Damage that Results from Third-Party Acts.**

The last category of damages Breathitt seeks is $2,183 relating to the cost of repairing property damage allegedly caused by social media.  When specifically asked about property damage, Breathitt testified only about damage to bathrooms and bathroom soap dispensers that occurred during a "TikTok challenge."  Ex. 24 (March 11, 2025 Rule 30(b)(6) Deposition of Daphne Noble ("March 11, 2025 D. Noble 30(b)(6) Dep.")) 57:12–58:8.  This damage was indisputably caused by third-party acts, such as alleged vandalism purportedly stemming from social media challenges, and, as explained above, the Court has precluded Breathitt from recovering for such conduct unless it can show that Defendants promoted the third-party content, such as by creating a filter to facilitate the challenge or paying participants cash prizes.  SD Order at 25.  Breathitt has no such evidence.  Ex. 24 (March 11, 2025 D. Noble 30(b)(6) Dep.) 74:20–75:5.

**C.      Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy under the Law.**

Breathitt seeks payment of over *$60 million* to implement a voluntary 15-year "strategic plan," authored by its expert, Dr. Sharon Hoover, to address anticipated student wellbeing and learning issues in the future.  The plan does not mention Defendants or their platforms, does not recommend that Breathitt stop allowing its students to access Defendants' platforms on its networks or devices, and does not recommend changes to Defendants' conduct.  The plan's recommended staffing levels have no relationship to the number of Breathitt's students using Defendants' platforms or the amount of time they spend on the platforms.  Nor is the plan tied to addressing mental health issues allegedly resulting only from Defendants' platforms:  the plan's recommendations are divorced from any attempt to estimate the level of alleged harm *from Defendants' platforms* to Breathitt or its students.  Instead, the plan applies to *all* students *regardless* of whether they use Defendants' platforms.  For example, the plan recommends hiring and training new employees to provide, among other things:

- "Life skills programming" to teach students "empathy, emotion regulation, [and] navigating social media pressure";

- "Mental Health literacy" to educate students, educators, and families about mental health challenges, not just those limited to use of Defendants' platforms;

- Promotion of in-person social activities such as clubs and community events to encourage belonging; and

- "Intensive mental health treatment" for students allegedly suffering from psychological effects of social media and other causes.

*See* Ex. 25 (Am. Hoover Rep.) ¶¶ 72–73, 76, 81. In short, the plan is a multi-million-dollar attempt to solve resource and funding problems that long predate and have nothing to do with Defendants' platforms.

Breathitt's strategic plan is not a proper remedy for any of Breathitt's claims. *First*, Breathitt cannot recover the strategic plan as equitable relief for its nuisance claim for two separate reasons: (i) Breathitt has admitted it has an adequate remedy at law—damages for its alleged nuisance and negligence claims—which forecloses any equitable relief; and (ii) even if Breathitt lacked an adequate remedy at law, the strategic plan is not a permissible equitable remedy under Kentucky law. *Second*, Breathitt's strategic plan is not recoverable as future damages for its negligence claim because the plan's 15 years of expenditures do not compensate Breathitt for money that Breathitt will, with reasonable certainty, have to spend in the future. *Third*, even if the plan qualified as permissible equitable relief or future damages, the largest component of the strategic plan—the funding of mental health treatment for students—is impermissibly derivative of alleged injuries to students.

### 1. Breathitt Cannot Recover the Plan as Equitable Relief for Its Nuisance Claim.

#### a) Breathitt has an adequate remedy at law.

To obtain equitable relief, a plaintiff must show that it lacks an adequate remedy at law, which Breathitt cannot do because it admits that damages are available for the same alleged harms. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) (plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution"); *Wood v. Marathon Refin. Logistics Serv. LLC*, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (Gonzalez Rogers, J.) (granting summary judgment on equitable remedy because "Plaintiffs have not explained why the existing remedy [at law] is inadequate").

Here, Breathitt's nuisance and negligence claims rest on the same alleged conduct—the design of Defendants' platforms—and its proposed "strategic plan" is offered as both abatement and future damages. *See* ECF 2184 at 6 ("[I]n addition to abatement for those SDs with live nuisance claims, the

plans also serve as a measure of future damages under their negligence claims."). That overlap makes equitable relief unavailable regardless of whether Breathitt is able to prove future damages (which as discussed below, it is not). *See Sonner*, 971 F.3d at 844 (affirming dismissal of claim for equitable relief because plaintiff "seeks the same sum in equitable restitution as … she requested in damages to compensate her for the same past harm").

Courts have consistently held that a remedy is "adequate" where damages are legally available, even if the plaintiff ultimately cannot prove entitlement to them. *See, e.g.*, *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable." (emphasis in original)); *Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825, at *3 n.3 (N.D. Cal. June 17, 2016) (dismissing UCL claim because an adequate remedy at law existed through the "compensatory damages" sought by the plaintiff, even though all legal claims were simultaneously dismissed as barred by the statute of limitations; "the fact that Robinson's other claims have been barred by the statute of limitations does not affect the court's analysis"). The real problem here is not that Breathitt lacks an adequate remedy at law but its inability to prove its entitlement to that remedy.

### b)    The strategic plan is not a proper "abatement" remedy.

Even if Breathitt had no adequate remedy at law, the strategic plan is not a proper abatement remedy under Kentucky law. In Kentucky, a public nuisance is an unreasonable interference with a right common to the general public. *See Roberie*, 2006 WL 2454647, at *3. The remedy of abatement for a public nuisance under Kentucky law has historically involved an injunction directing the offending party to cease *the conduct* causing the alleged nuisance. *See, e.g.*, Equitable relief, Ky. L. of Damages § 31:8 (collecting cases equating abating the nuisance with enjoining the offending conduct).

Breathitt's abatement plan does nothing of the sort. *First*, the plan has nothing to do with "abating" any conduct of Defendants. The plan would not require Defendants to change how they design, operate, or market their platforms in general or for youth specifically. Ex. 27 (August 13, 2025 Hoover Dep.) 526:1–3 ("I don't think I'm offering an opinion that the social media companies change their design."). There are no recommendations, for example, for Defendants to get rid of filters or use better or different

29

warnings or parental controls.  Instead, Breathitt seeks $60 million to fund a voluntary plan that it could spend in its unfettered discretion to implement an expansive range of programs for the social and emotional wellness of students regardless of whether those students use or are otherwise exposed to Defendants' platforms.  *See* Ex. 31 (Deposition of Douglas Leslie ("Leslie Dep.")) 67:11–14 ("Q. Do you understand that the plan and its components are not mandated or required by anything?  A. That's my understanding.").  That is not proper "abatement" relief—this is a school district attempting to use litigation to fundraise for basic school programs that would be desirable regardless of whether Defendants' platforms existed.  *See, e.g.*, *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 483–84 (S.D.W.V. 2022) (rejecting abatement plan "directed" at treating downstream harms of opioid use, rather than "any of defendants' alleged nuisance-causing conduct"); *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021) (rejecting abatement plan that "does not stop the act or omission that constitutes a nuisance").

*Second*, the plan is not tied to the harms allegedly resulting from the design of Defendants' platforms, and it goes far beyond what would be necessary to address any impacts of the design of Defendants' platforms on Breathitt.  The plan purports to provide treatment for "students experiencing stress, anxiety, or emotional stress, including"—but, critically, not limited to—"those struggling with the negative impacts of social media." Ex. 25 (Am. Hoover Rep.) ¶ 76.  The plan is about supporting students up to 15 years in the future, which includes potential students who are now babies—and those who are not yet even born—and have neither attended Breathitt schools nor used, much less suffered any harm from, any Defendant's platforms.  And it is impossible to predict whether any of those babies and unborn children will ever use Defendants' platforms or their allegedly harmful features, if those features or platforms still even exist years in the future.  Thus, the plan is overinclusive and goes far beyond addressing harms allegedly caused by Defendants.  But at the same time, the services recommended in the plan would not be available to help many current students who are allegedly suffering harms related to Defendants because they will age out of the Breathitt school system before any plan is implemented.  *See* Ex. 25 (Am. Hoover Rep.) ¶ 6.  Thus, even if it were proper "abatement" relief to remediate the downstream personal injuries allegedly resulting from nuisance-causing conduct, the strategic plan does not do that.  It is not tied to remediating mental health issues allegedly caused by Defendants but is instead

a wish-list of programs that schools could provide in an ideal world to benefit all students and to solve endemic staffing and budget problems that were not created by Defendants. Ex. 26 (August 12, 2025 Hoover Dep.) 300:17–302:19 (agreeing that, regardless of whether they use social media, all students should receive counseling services and education on digital literacy, mental health literacy, life skills, screen time management), 306:12–307:5 (agreeing that students should receive mental health support regardless of whether they use social media); Ex. 27 (August 13, 2025 Hoover Dep.) 631:24–636:1, 637:15–638:6 (agreeing that every teenager can benefit from components of plan), 644:7–647:23 (explaining why 47 to 48 of the 50 states do not meet national recommendations on the number of school psychologists: "[W]e have a context and a history of … workforce challenges with respect to school psychologists…. [I]n my experience with districts, it's because they don't have the resources to hire the needed professionals…. [I]t's often because they don't have the funding to hire a needed school psychologist.").

No Kentucky cases (or any appellate cases in the country) have recognized the sort of "monetary abatement" remedy that Breathitt seeks. Defendants are aware of only two trial courts in the country that have awarded this type of monetary abatement to treat downstream consequences of alleged nuisance-causing conduct, both in the context of the opioid litigation. One (the Ohio MDL federal court) was vacated on appeal when the Sixth Circuit overruled the MDL court and held (like the only other appellate court to have considered the issue, the Oklahoma Supreme Court) that there was no cause of action for public nuisance under the circumstances in the first place.[10] The other is a Maryland state trial court decision, which relied on that vacated MDL opinion.[11] Breathitt's strategic plan is therefore not proper abatement relief and should be denied as a matter of law.

[10] *In re Nat'l Prescrip. Opiate Litig.*, No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025) (citing *In re Nat'l Prescription Opiate Litig.*, 179 Ohio St. 3d 74, 78 (2024)) (recognizing that Ohio State Supreme Court, via certified question, held that state statute overruled prior Ohio Supreme Court case permitting a cause of action for public nuisance against gun manufacturers for unreasonably interfering with the public health and safety, and holding that nuisance claims brought by Ohio cities and counties in opioid litigation should have been dismissed at the outset).

[11] *See Mayor & City Council of Baltimore v. Purdue Pharma, L.P.*, No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025). There, the trial court held that the City of Baltimore could recover as an equitable remedy (continued…)

31

Breathitt's abatement plan would not pass muster even under cases that have permitted the payment of money as an equitable abatement remedy. *See, e.g.*, *People v. ConAgra Grocery Products Co.*, 17 Cal. App. 5th 51 (2017); *In re JUUL Labs Inc. Marketing, Sales Pract. & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 653 (N.D. Cal. 2020). In *ConAgra*, the abatement remedy consisted of an order for defendants to fund the *removal of the lead paint* from homes. 17 Cal. App. 5th at 132–33. It did not involve a monetary fund to treat downstream consequences of the alleged nuisance, like funding for medical expenses or other treatment. Indeed, the court specified that "the abatement account would be utilized *not to recompense anyone for accrued harm* but solely to pay for the prospective removal of the hazards"—*i.e.*, removal of the lead paint from homes. *Id.* at 133. The abatement remedy was therefore tied to eliminating the defendants' conduct and removing the pollutant from the environment, not treating injuries from lead paint ingestion. As for *JUUL*, the court held at the motion-to-dismiss stage only that an abatement fund might theoretically be proper and agreed with the general principle that "an equitable remedy's *sole* purpose is to eliminate the hazard that is causing prospective harm to the plaintiff." 497 F. Supp. 3d at 653 (emphasis added) (quoting *ConAgra*, 17 Cal. App. at 132). The court was not faced with a fully developed evidentiary record of what the prospective fund might consist or whether the proposed fund was actually tailored to address the alleged nuisance.

### 2.    The Costs of the Strategic Plan Are Not Recoverable as Future Damages.

Nor can Breathitt recover the costs to fund its strategic plan by classifying the costs as future damages. Kentucky law requires that future damages be "reasonably certain" to occur. *May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct. App. 2010).

Breathitt cannot show that it reasonably expects *to have to* make the expenditures recommended in Hoover's plan over the next 15 years as a result of Defendants' actionable conduct. Rather, the plan is a separate, *recommended* expense that Breathitt *could*, but does not have to, expend to fund programs to

---

a "monetary abatement remedy" from two distributors of prescription opioids to fund certain voluntary programs aimed at reducing harms associated with both legal and illegal opioid abuse. The court did not cite any Maryland cases that have awarded such a "monetary abatement remedy," but relied only on the overturned opioid MDL trial court. In any event, even that opinion would not support the vast majority of Dr. Hoover's plan because the court rejected the City's request for funding for "all of the proposed costs for treatment services and for supplies of the three … medications used in treatment." *Id.* at 26.

deal with student mental health generally, untethered to any specific features of Defendants' platforms. Breathitt has not instituted the Hoover plan, it is under no obligation to do so, and absent a recovery of money from Defendants in this lawsuit, Breathitt will *not* institute the plan or incur the associated costs. And while Dr. Hoover testified that the plan constitutes "best practices," no public school district in the country has ever implemented this type of comprehensive plan, and there is no professional organization that has ever suggested that a plan of this nature is necessary or advisable to address student use of social media in general, much less just Defendants' platforms. *See* Ex. 27 (August 13, 2025 Hoover Dep.) 605:23–607:16, 612:7–23, 806:22–807:6. A suggestion of expenditures for a novel set of optional, recommended programs that might be made only if a plaintiff receives a large monetary award in a lawsuit is not the type of "reasonably certain" future damage that is recoverable in Kentucky. *See May*, 320 S.W.3d at 128.

### 3.   Breathitt's Strategic Plan Is Impermissibly Derivative.

As discussed above, funding for the strategic plan is not compensation for direct and distinct expenditures that Breathitt has been forced to make or will be forced to make as a result of Defendants' alleged tortious conduct. Instead, the plan is about developing discretionary programs to educate, treat, and support *students* for their alleged injuries. Paying for treatment of others' injuries is the type of classic derivative injury for which recovery is not available. *See Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001) (rejecting public hospital districts' attempt to recover costs for treating patients suffering from tobacco-related illnesses).

At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on the basis that their alleged harms are impermissibly derivative of students' alleged harms. SD Order at 21. The Court's reasoning was based on allegations that the School Districts had been directly injured because "they *have had to* hire mental health personnel and develop further mental health resources to mitigate the negative in-school consequences of their students' . . . use of defendants' platforms" and because "the school districts appear to seek *recovery of unique damages*." *Id.* at 20–21 (emphasis added). The record evidence now demonstrates that Breathitt does not seek recovery for those types of injuries, but to institute a sweeping plan for the benefit of students that it will not otherwise implement or be forced to implement.

Thus, even if funding for the strategic plan were the type of legally cognizable damages or abatement that Breathitt could recover, any recovery would be for derivative injuries.

### D. Defendants Are Entitled to Summary Judgment on Breathitt's Failure-to-Warn Claim.

Breathitt contends that "Defendants failed to adequately warn [Breathitt] about the physical and mental health risks posed by their platforms and the increased resources that [Breathitt] would need to expend to address the youth mental health crisis Defendants caused."  Pls.' First Amended Master Compl. (Local Government and School District) ("Master Compl.") (ECF 729) ¶ 1034.  But Defendants do not owe a duty to provide warnings to a school district that its students' use of Defendants' platforms may cause financial harm to the district.[12]  Even if there were a duty to warn school districts, Breathitt's claims fail for lack of evidence: Breathitt has no evidence of what a warning to school districts should have said, to whom or how it should have been made, or that any warning would have reduced Breathitt's alleged damages.

And to the extent that Breathitt contends that Defendants owed a tort duty *running to Breathitt* to provide warnings *to its students* (or their parents), its claim likewise fails.

### 1. Defendants Do Not Owe Breathitt a Duty To Warn the District Directly.

The District advances a novel theory on its failure-to-warn claim:  it alleges that Defendants had a duty to provide a warning to school districts—distinct from the warnings that allegedly should have been provided to student users and parents—that student use of the platforms could cause harm to those students, which might, in turn, cause the school district to expend additional resources in responding to the harms to the students.  Master Compl. ¶¶ 1034, 1036.  Defendants are not aware of any case in any jurisdiction that has held there is a duty to warn a non-user of a product or service that others' use of that

---

[12] Defendants also contend that they are entitled to summary judgment on Breathitt's failure-to-warn claim that arises from third-party content or protected publishing activities for the threshold reason that they are barred by Section 230.  *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025) (barring claim "that Grindr had a duty to warn Doe about the risks of child sexual exploitation on the App"); *Est. of Bride*, 112 F. 4th at 1179–80 (9th Cir. 2024) (barring failure to warn claim challenging anonymity feature of app that faulted app "for not mitigating, in some way, the harmful effects of the harassing and bullying content" through anonymity feature).  Per the Court's instructions given the pending appeal by Meta and TikTok, Defendants reserve their right to challenge Breathitt's failure-to-warn claims as being barred by Section 230 at a later time.

product or service may cause financial injury to the plaintiff. Such a rule would lead to an absurd result—*e.g.*, alcohol companies may need to warn landlords that their tenants might damage property while under the influence of alcohol, and tobacco companies may need to warn employers that they might need to pay increased healthcare costs for employees who smoke. And even in cases involving *physical* injuries, courts have held that a defendant has no duty to warn third parties that they might become indirectly injured by a defendant's alleged negligence. *See, e.g.*, *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 645–46 (Ga. 2016) (finding manufacturer of a facility's "asbestos-laden water pipes" did not have a duty to warn plaintiff of the dangers of asbestos dust where she claimed she developed mesothelioma from laundering the asbestos-dust-covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 945 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of coronavirus at work). If there is no duty to warn a third party that a product might cause physical injury, then there is certainly no duty to warn a third party that the use of the product could cause downstream financial injuries.

While Defendants acknowledge that the Court previously held that Defendants owe a general duty of care to School Districts, they respectfully submit that the Court's analysis does not support finding a duty to provide a warning directly to School Districts about potential financial harms resulting from student use. None of the cases relied on by the Court in its prior rulings contemplate a duty to warn third parties that someone else may use the defendant's product or service, become injured, and thereby cause downstream economic consequences to the third party. *See generally* SD Order. Recognizing such broad duties "would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by" the user's use of the product or service. *Gourdine v. Crews*, 955 A.2d 769, 786 (Md. Ct. App. 2008).

**2.      Breathitt Lacks Evidence Supporting Its Failure to Warn Claim.**

Even if Defendants owed Breathitt a duty to warn, the claim still fails.[13] A plaintiff asserting a failure to warn claim must show "the inadequacy or absence of the warning caused the injury." *Jones by*

---

[13] The Court already held that any duty to warn is limited by Section 230 to warnings about platform *features* and *designs*. *See* SD Order at 34.

*& through Jones v. IC Bus, LLC*, 626 S.W.3d 661, 680 (Ky. Ct. App. 2020) (quoting  Am. L. Prod. Liab. 3d Pt. 9, Warnings, § 34:1).  In other words, a plaintiff must show that it would have behaved differently with the warning.  *Id*.  In the circumstances at issue here, where the adequacy and efficacy of a warning to a school district about alleged financial consequences from student use of online platforms "are not within the common knowledge of jurors . . . , expert testimony is necessary to support [Breathitt's] warning defects claim." *Nelson v. Am. Honda Motor Co.*, 2021 WL 2877919, at *8 (W.D. Penn. May 17, 2021).

Yet none of Breathitt's experts opined that Defendants should have warned school districts (as opposed to users and parents), save for one isolated statement.  *See* Ex. 32 (Report of Timothy Estes ("Estes Rep.")) ¶ 316 (stating only that "it is critical that parents, children and the public (including schools) [should] be fully informed about the risks and harms the platforms present").

Nor has Breathitt offered any evidence (fact or expert) of what a warning to school districts should have looked like or how it should have been implemented.  Specifically, there is no evidence of *who* in the districts should have received the warning, *what* it should have said, *when* it should have been provided, or *where* and *how* the warning should have been communicated.  These are all significant questions given that the allegation is that a warning should be provided to entities that may not themselves be users of or have any interaction with the platforms.  Because the record is silent on each point, Breathitt has not met its burden of proof.

Perhaps most critically, Breathitt has not offered any evidence (fact or expert) that a warning directly to the District would have reduced its alleged harms or damages.  There is no competent evidence that, in the face of such a warning, Breathitt itself would have further restricted access to Defendants' platforms by students.  The only record evidence is to the contrary: Breathitt continues to allow students to access those platforms even now, years after filing suit.  *See, e.g.,* Ex. 33 (March 11, 2025 Deposition of Daphne Noble ("March 11, 2025 D. Noble Dep.")) 7:16–10:10 (acknowledging that Breathitt High School Facebook page had recently posted the night before her deposition and that the Facebook page is a good way to communicate with families and students).  There certainly is no evidence that a warning to *the school district* would have caused any *student* to use Defendants' platforms less and thereby avoid the alleged harms of addiction and mental health problems in the first place, much less that *a sufficient number*

36

*of students* would have used the platforms less and experienced such fewer harms that Breathitt would have had to expend materially fewer resources in responding to the alleged youth mental health crisis in the district.  Summary judgment is therefore warranted.

### 3.    Breathitt Cannot Assert a Claim that Defendants Failed To Warn Students.

To the extent that Breathitt claims that Defendants had a duty running to the District based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Compl. ¶ 265, Defendants are also entitled to summary judgment.[14]

On this point, *Gourdine*, 955 A.2d at 786 is instructive.  There, the plaintiff sued a pharmaceutical manufacturer after a driver suffering adverse effects from the defendant's medications struck and killed plaintiff's husband.  The plaintiff acknowledged that the manufacturer did not owe a duty to provide warnings directly to her husband.  Instead, she sought to recover for injuries flowing from the manufacturer's failure to provide adequate warnings to the users of its medications.  The court rejected that effort, holding that even if the warnings provided to users were inadequate and automobile accidents were a foreseeable result of the inadequate warnings, the manufacturer did not owe a duty to warn users running to and enforceable by potential secondary victims like plaintiff's husband.  As the court explained, "there was no direct connection between [the manufacturer's] warnings, or the alleged lack thereof, and [plaintiff's husband's] injury.  In fact, there was no contact between [the manufacturer] and [plaintiff's husband] whatsoever." *Id.*

The same is true of Breathitt.  It does not claim harm as a direct user of Defendants' platforms, but that it was a secondary victim of Defendants' alleged failure to warn users that they could become addicted or suffer mental health harms from use of Defendants' platforms.  Imposition of a duty to warn users of Defendants' platforms that runs from Defendants to school districts is thus unwarranted and unsupported. *Id.*; *see also Doe v. Pharmacia & Upjohn Co.*, 879 A.2d 1088, 1096 (Md. Ct. App. 2005) (employer had no duty running to employee's wife to warn employee of the risk of HIV infection even though employer knew employee was exposed to HIV in his work and that he was married).

---

[14] Breathitt does not purport to bring representative claims on behalf of its students or their families.  Nor could it.  *See* ECF 601 at 44 & n.34 (collecting authorities).

### E.    Breathitt's Claims Are Barred by the Statute of Limitations.

Kentucky has a one-year statute of limitations for negligence claims and a five-year statute of limitations for public nuisance claims. *See* KRS 413.140(1)(a); *Franzman v. Wyeth, Inc.*, 451 S.W.3d 676, 692 (Mo. Ct. App. 2014) (applying Kentucky law); *Lynn Min. Co. v. Kelly*, 394 S.W.2d 755, 757 (Ky. 1965).[15] "Generally, a cause of action accrues when the injury occurs." *Exec. Branch Ethics Comm'n v. Grimes*, 710 S.W.3d 8, 16 (Ky. Ct. App. 2025) (cleaned up). Kentucky does not generally utilize the discovery rule: it applies only in limited categories of cases, and Kentucky courts are hesitant to expand its reach. *See id.* at 17. Regardless of which length applies, and regardless of whether the discovery rule applies, however, Breathitt's claims accrued more than five years before it filed suit on March 30, 2023. Accordingly, summary judgment is appropriate.

Breathitt claims that its injury was first inflicted during the 2015–16, the first school year for which it seeks past damages. *See* Ex. 12 (Second Am. Ward Rep.) ¶¶ 44–45. That alone settles this issue: Breathitt's injuries began more than five years before filing the suit.[16]

Even if the discovery rule applied, Breathitt's own allegations and testimony show that it knew (or reasonably should have known) "(1) that [it] has been wronged, and (2) by whom the wrong has been committed," *Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000), more than five years before filing suit. For example, Superintendent Phillip Watts testified that, beginning in 2017, he spent approximately 20 percent of his work time on the social-media related concerns raised by Breathitt in this lawsuit. *See* Ex. 19 (July 28, 2025 P. Watts Dep.) 48:1–49:16. Similarly, Jeremy Hall, Principal of Sebastian Elementary School, testified that in 2018 he was already dealing with the issues Breathitt raises in this lawsuit. *See* Ex. 21 (July 28, 2025 Hall Dep.) 31:14–32:1. William Noble stated that, prior to the 2016 school year, Breathitt had to install an online filtering tool on its systems to filter out social media sites for students and guests on the school networks. Ex. 18 (Affidavit of William Noble) ¶ 7; *see also*

---

[15] Kentucky has a five-year statute of limitations for certain property-based negligence claims. *See* K.R.S. 413.120(4). Even if that statute of limitations applied here, the claims would be stale under it for the reasons described.

[16] The "continuing violation" rule that exists in some jurisdiction applies only to trespass to land in Kentucky. *See Dodd v. Dyke Indus.*, 518 F. Supp. 2d 970, 976 (W.D. Ky. 2007).

Ex. 34 (Pl.'s Interrogatory Resp.) p. 6. (Breathitt claims it had to "install a webfilter/application called Lightspeed Filter . . . to filter out social media sites" in 2016). Defendants do not concede that those actions can result in liability, and they do not demonstrate causation for the reasons explained above, but they do demonstrate that Breathitt's own employees felt that social media was having effects in the classroom. Yet Breathitt waited years, until it could join a preexisting MDL, rather than timely asserting its rights.

### F. The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries.

SD Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section, "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible for the development and operation of Facebook and Instagram. *See* Ex. 35 (Meta Defendants' Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question ("DWQ")) at 21–22, 25. The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc., Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram. *See id.*

Summary judgment should therefore be awarded to the Non-Operating Defendants for the additional reason that they had no involvement in Plaintiff's alleged injuries. "As a general matter, corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely have legal independence from each other and each can only be held liable for its own acts or omissions." *Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *14 (N.D. Cal. Oct. 5, 2020) (surveying California and Delaware law); *see also Mattingly v. R.J. Corman R.R. Grp., LLC*, 90 F.4th 478, 488 (6th Cir. 2024) ("Under Kentucky law, separate corporate interests, including subsidiaries and affiliates are separate legal entities and must be recognized and treated as such unless there is some reason to pierce the corporate veil . . . found only in the rarest of circumstances." (cleaned up)).[17] And to sustain its claims, Breathitt must prove that *each Defendant* caused it harm. *See supra* Section IV.A. But Breathitt has no

---

[17] Because this outcome is required under the laws of all three states potentially at issue, Meta does not apply a choice-of-law analysis or take a position on which state's law applies to this question.

evidence by which to do so. Indeed, the evidence shows that the Non-Operating Defendants engage in activities wholly unrelated to the school districts' claims, namely: "payment processing" (Facebook Payments Inc); "operat[ing] . . . data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "holding certain Instagram intellectual property" (Instagram, LLC). Ex. 35 (DWQ) at 21–22, 25. For this additional reason, the Non-Operating Defendants are all entitled to summary judgment.

## V.    CONCLUSION

Defendants seek entry of summary judgment in their favor on all causes of action that Breathitt asserts against Defendants or, in the alternative, partial summary judgment as to Plaintiff's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

DATED:  September 30, 2025

Respectfully submitted,

By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones (*pro hac vice*)
Paul W. Schmidt (*pro hac vice*)
Christian J. Pistilli (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings,*

*LLC; Facebook Operations, LLC; Meta Payments, Inc. f/k/a Facebook Payments, Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

/s/ John J. Nolan
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

/s/ Geoffrey M. Drake
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, pro hac vice
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

41

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants TikTok Inc.,
ByteDance Inc., ByteDance Ltd., TikTok Ltd.,
and TikTok, LLC*


*/s/ Ashley Hardin*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and
Google LLC*

**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED:  September 30, 2025          By:   */s/ John J. Nolan*
                                           John J. Nolan
                                           *Attorney for Defendant Snap Inc.*

                                    By:   */s/ Christian J. Pistilli*
                                           Christian J. Pistilli
                                           *Attorney for Defendants Meta Platforms,*
                                           *Inc. f/k/a Facebook, Inc.; Facebook*
                                           *Holdings, LLC; Facebook Operations,*
                                           *LLC; Meta Payments Inc. f/k/a Facebook*
                                           *Payments Inc.; Meta Platforms*
                                           *Technologies, LLC f/k/a Facebook*
                                           *Technologies, LLC; Instagram, LLC; and*
                                           *Siculus LLC f/k/a Siculus, Inc.*

                                    By:   */s/ David P. Mattern*
                                           David P. Mattern
                                           *Attorney for Defendants TikTok Inc.,*
                                           *ByteDance Inc., ByteDance Ltd., TikTok*
                                           *Ltd., and TikTok, LLC*

                                    By:   */s/ Ashley W. Hardin*
                                           Ashely W. Hardin
                                           *Attorney for Defendants YouTube, LLC and*
                                           *Google LLC*

**FILER'S ATTESTATION**

I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:  September 30, 2025          By:   */s/ Ashley M. Simonsen*
                                           Ashley M. Simonsen