**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **BREATHITT COUNTY SCHOOL DISTRICT** *by and through the* **BREATHITT COUNTY BOARD OF EDUCATION**,<br><br>　　　Plaintiff,<br><br>　v.<br><br>**META PLATFORMS INC., SNAP INC., TIKTOK INC., YOUTUBE LLC, ET AL.**,<br><br>　　　Defendants. | Case No. 4:23-cv-01804-YGR |
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION** | 4:22-md-03047-YGR<br><br>MDL No. 3047 |
| This Document Relates to:<br><br>ALL CASES | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

Before the Court is defendants' motion for summary judgment on Kentucky plaintiff[1]

Breathitt County School District's ("Breathitt") claims of negligence and public nuisance against

the defendants, namely Meta's Facebook and Instagram, Google's YouTube, ByteDance's TikTok,

and Snapchat. The Court has carefully considered the parties' pleadings, briefs, evidence, and

argument at the January 26, 2026 hearing, and as explained below, **DENIES** defendants' motion for

summary judgment.

---

[1] The parties' briefing and evidence is filed across the Court's central and member case dockets. When referring to cross-cutting issues or the parties' omnibus briefing, the Court will cite to the MDL's central docket. (Case No. 4:22-md-3047-YGR.) Because omnibus issues involve more than plaintiff Breathitt School District, the Court will at times refer to all school district plaintiffs with the term "plaintiffs." In general, evidence specific to a specific school district is found in the docket for that particular case. For this Order, the Court cites to the Breathitt docket (Case No. 4:23-cv-01804-YGR) only where those filings are not also found on the central docket.

## I.    MOTIONS TO SEAL

As a preliminary matter, both sides have submitted numerous motions to seal documents or portions of documents offered in support of their summary judgment briefing. At summary judgment, materials may be sealed if there are "compelling reasons" to do so. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016). The Court finds that many of the sealing requests here based upon "confidential" or "proprietary" information are overbroad and compelling reasons have not been established to seal certain documents to the extent requested. At the January 26, 2026 hearing, the Court warned that it generally declines to seal such information contained in documents more than three years old. Therefore, regarding all materials referenced in this Order sought to be sealed on the basis of confidential or proprietary information, the Court DENIES the motions to seal. The Court will address the remaining sealing disputes at a later date.[2]

## II.    BACKGROUND

### A.    FACTUAL OVERVIEW

Breathitt schools serve a community in rural Kentucky. Breathitt students have used each of defendants' platforms. (*See, e.g.*, Dkt. No. 2368-7, Declaration of Ronald Johnson ["Johnson Decl."], Ex. 5 (referencing Breathitt student use of Instagram); Ex. 18, 26:16-18 ("[B]iggest challenge that [Breathitt] teachers" face is "keeping kids off YouTube"); Ex. 21 (describing damage from Breathitt student participation on TikTok challenges); Dkt. No. 2368-8, Johnson Decl., Ex. 6, 72:9-10 ("Snapchat is the one that we see the most [used by Breathitt students]").)

Breathitt was aware their students were using defendants' platforms as early as 2016, when plaintiff installed an online filtering tool to prevent students and guests from accessing social media sites on school networks. (*See* Dkt. No. 2297-37, Declaration of Ashley Simonsen ["Combined Simonsen Decl."], Ex. 34 at 6.) Superintendent Phillip Watts testified that beginning in 2017, he spent approximately 20 percent of his work time on "social media related concerns." (Dkt. No. 2297-91, Combined Simonsen Decl., Ex. 88, 48:1–49:16.)

---

[2] Disputes regarding employee names, emails, and other personal information, including as to exhibits cited in this Order, will be addressed by the Court in a forthcoming order.

As early as 2015, defendant Meta's employees were strategizing about how to increase student platform use during the school day. (*See* Dkt. No. 2648-43, Declaration of Previn Warren in Support of Corrected Omnibus Opposition ["Am. Warren Decl."], Ex. 373 at 0761 (describing feedback from teen users, a Meta employee shared that "it wouldn't work because if they did that during class, the teacher would notice and they'd get in trouble" so "one of the things we need to optimize for is sneaking a look at your phone under your desk in the middle of Chemistry :) ".)

Defendant TikTok has engaged in public relations efforts to manage the platform's image among parents and teachers, as demonstrated by its relationship with the national Parent Teacher Association ("PTA"). (*See* Dkt. No. 2650-6, Am. Warren Decl., Ex. 444A at 225:7-13, 226:10-20 (describing TikTok employees' response to a PTA panel on which children under 13 admitted they lied about their birthdate); *id.* at 225:23-226:3 (confirming executives responded that they "need[ed] a quick post mortem" so they could "talk to" contacts at the national PTA).)

Defendant Snapchat also has directed its strategy in reference to schools specifically. During back-to-school periods, Snap observed large spikes in new friendship, finding that users add "47% more friends from Group Chats during back to school months." (*See* Dkt. No. 2649-16, Am. Warren Decl., Ex. 857 at 0369.) This surge early in the school year provided "a tailwind for engagement for the remainder of the year," and led to sustained use throughout the school year. (*Id.* at 0359-60.)

Finally, as early as 2013, YouTube employees examined the "smartphone / tablet / app explosion" in "Pre-K / Primary," and investigated the possibility of "flip[ping] the classroom" in high school (*see* Dkt. No. 2573-2, Am. Warren Decl., Ex. 752 at 24) by which teachers would replace in-class lectures with YouTube videos assigned as homework. (*Id*. at 24-25.)[3]

### B. PROCEDURAL BACKGROUND

As set out previously in the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the School District and Local Government Entities' Master Complaint ("MTD Order"), Dkt. No. 1267, Breathitt's and the other plaintiffs' theory is three-fold:

---

[3] Additional evidence regarding defendants' efforts to target schools and/or students exists that the Court need not cite in detail here to address whether summary judgment should be granted.

First, defendants deliberately designed their social media platforms to foster compulsive use and addiction in minors, whose mental and physical health deteriorated. Second, as a result, Breathitt and the other plaintiffs expended substantial financial resources to mitigate the consequent mental health and behavioral issues their students suffer as a result thereof. Third, defendants targeted schools. Defendants dispute that the proffered facts are sufficient to support that theory.

In short, Breathitt, like the other school district plaintiffs, sues defendants on the theory that their platforms' design engenders students' compulsive and problematic use, causing disruption with which the district is forced to cope. At the Motion to Dismiss stage, defendants argued that Breathitt's negligence and nuisance claims were barred by Section 230 of the Communications Decency Act of 1996, which provides certain protections to online platforms, and the First Amendment. Notably, the Court did not discuss in detail the claim for failure to warn addressed herein at Section E.[4]

Upon Motion to Dismiss, the Court held that Section 230 and the First Amendment place "a fairly significant limitation" on the claims Breathitt and the school districts can bring but do not immunize defendants' platforms. (MTD Order at 2.) The Court explained that the school districts may proceed on a "core theory of injury [which] focuses on the impact of compulsive use *itself*, irrespective of third-party content, defendants' protected publishing activity and defendants' protected first-party speech." (*Id*. at 26.) The Court further explained that "many of plaintiffs' alleged defects are barred by Section 230 or the First Amendment," but that plaintiffs' case could move forward on the "defects that are not barred." (*Id*.) The Court identified those non-barred (actionable) pled defects as:

- Failure to implement robust age verification processes to determine users' ages;
- Failure to implement effective parental controls;
- Failure to implement effective parental notifications;
- Failure to implement opt-in restrictions to the length and frequency of use sessions;

---

[4] The MTD Order did note that "at this stage the Court declines to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general." (MTD Order at 45.)

- Creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;
- Failure to label content that has been edited, such as by applying a filter;
- Making filters available to users so they can, among other things, manipulate their appearance; and
- Failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

(Collectively referred to herein as the "Actionable Defects.") The Court held that the remaining alleged defective features could not support plaintiffs' claims:

- Failing to put default protective limits to the length and frequency of sessions;
- Failing to institute blocks to use during certain times of day (such as during school hours or late at night);
- Not providing a beginning and end to a user's "Feed";
- Publishing geolocating information for minors;
- Recommending minor accounts to adult strangers;
- Limiting content to short-form and ephemeral content, and allowing private content;
- Timing and clustering of notifications of third-party content in a way that promotes addiction; and
- Use of algorithms to promote addictive engagement.

In short, the MTD order permitted plaintiffs to proceed with claims based on six types of allegedly-defective features: defective parental controls and age verification; failure to assist users in limiting in-app screen time; creating barriers to account deactivation and/or deletion; failure to label edited content; making filters available to users to manipulate content; and failure to enable processes to report CSAM. Here, Breathitt's claims for damages relate to the purported addictive design of the platforms, as driven by the first three categories of Actionable Defects. Breathitt does not, at this stage, appear to argue that its damages are connected to filters or CSAM.

III.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

5

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing summary judgment motions, courts must view all evidence in the light most favorable to the nonmoving party and draw all justified inferences on its behalf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011) (courts must "draw all inferences supported by the evidence in favor of the non-moving party."). Additionally, in an MDL, the transferee court applies the law of its circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL. *In re Anthem, Inc. Data Breach Litig.*, 2015 WL 5286992, at *2 (N.D. Cal. Sept. 9, 2015) (collecting Ninth Circuit cases). For purposes of this motion, the Court will apply Kentucky law where required.

## IV.     ANALYSIS

Defendants move for summary judgment on Breathitt's claims for negligence and public nuisance. Defendants assert five independent grounds for summary judgment, namely:

*One,* Breathitt's purported injuries began during the 2015-16 school year, outside of the statute of limitations period, and thus present an independent bar to its claims.

*Two,* Breathitt fails to show causation—more specifically, that defendants' actionable conduct caused its harms. Defendants maintain that Breathitt's evidence is insufficiently specific to each of defendants' platforms, and that Breathitt's causation evidence concerns content and design features barred from liability under Section 230 and the First Amendment.

*Three,* Breathitt seeks impermissible damages. Here, defendants assert three arguments: one, that "lost time" damages, which make up the bulk of what Breathitt seeks, are not cognizable under Kentucky law. Two, the remaining damages are not based on the platforms' actionable conduct. Three, the methodology and sufficiency of evidence underlying Breathitt's damage calculations fail.

*Four*, Breathitt's abatement remedy is barred because money damages are adequate. Defendants argue that Breathitt's plan focuses primarily on providing mental health services to students, and thus is about the *students'* injuries, not the school districts'. In this way, the plan is

impermissibly derivative of the students' harms. Defendants also claim the scope and features of the plan lack a sound basis and are unrelated to abating the at-issue conduct.

*Five,* Breathitt's failure to warn claims fail because, as a matter of law, defendants do not have a duty to warn third parties that the use of their product could cause downstream financial injuries. Further, Breathitt also must (but cannot) show that a warning would have averted the harm.

The Court addresses each argument.

### A. STATUTES OF LIMITATIONS

On the issue of whether Kentucky's statutes of limitations bar Breathitt's negligence and public nuisance claims,[5] the parties do not dispute that Kentucky's statute of limitations for negligence is one year and for public nuisance is five years. *See* KRS 413.140(1)(a); KRS 413.120. Nor do they dispute that defendants bear the burden of proof to prove this affirmative defense. Ky. R. Civ. P. 8.03. Instead, they dispute the scope and applicability of the discovery rule.

Kentucky's discovery rule has evolved over time. Initially, Kentucky courts maintained that statutes of limitation periods began at the 'time of accrual.' *See Fitzhugh v. Louisville & N.R. Co.*, 300 Ky. 509 (1945). Since the 1970s, Kentucky courts have relied on a discovery rule in cases where a plaintiff did not discover the claim until after accrual. *Louisville Tr. Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 500 (Ky. 1979).

The Kentucky Supreme Court has explained that the Kentucky discovery rule is formulated similarly to that adopted by a majority of states such that, "the statute of limitations commences from the date the plaintiff knew or should have discovered 'not only that he has been injured but also that his injury may have been caused by the defendant's conduct.'" *Perkins v. Ne. Log Homes*, 808 S.W.2d 809, 819 (Ky. 1991) (quoting *Raymond v. Eli Lily & Co.,* 371 A.2d 170 (N.H. 1977)) (overruled on other grounds).[6] To discover that she has suffered an 'injury,' a plaintiff must know

---

[5] Plaintiffs object that this argument is procedurally improper because defendants failed to raise it in their pre-filing statement for the summary judgment motion. (Dkt. No. 2173.) The Court takes up defendant's argument now to avoid last-minute issues on the eve of trial.

[6] *See also Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000) ("The knowledge necessary to trigger the statute is two-pronged; one must know: (1) he has been

two things: (1) that she has been wronged; and (2) the identity of the person who wronged her." *Williams v. Altman, McGuire, McClellan & Crum, P.S.C.*, 2013 WL 28378, at \*4 (E.D.Ky. 2013). Accordingly, the Court finds that Kentucky law applies the discovery rule where an injury "has accrued in circumstances where the cause of action is not reasonably discoverable." *Handy v. Louisville/Jefferson Cnty. Metro Gov't*, 2024 WL 1146541, at \*7 (Ky. 2024) (citing *Michels v. Sklavos*, 869 S.W.2d 728, 732 (Ky. 1994)).

Defendants insist that in 2010 the Kentucky Supreme Court narrowed the application of the discovery rule when it refused "to extend application of the discovery rule to cases not involving latent injuries, latent illnesses, or professional malpractice." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 56 (Ky. 2010). However, that court's decision in *Handy* later clarified that while the discovery rule was developed in the context of medical malpractice, it is not limited to those types of claims. 2024 WL 1146541, at \*7 n. 4 (Ky. Mar. 14, 2024) ("[T]he discovery rule is most often applied in cases where a cause of action is not reasonably discoverable through due diligence *such as* medical malpractice where the rule finds its origin") (emphasis supplied). To the extent the parties identify some apparent inconsistency in Kentucky courts' application of the discovery rule, the confusion appears to have been caused in part because "'injury' is a term of art under Kentucky law." *Williams*, 2013 WL 28378, at \*4. Given the Kentucky Supreme Court's articulation, this Court finds no inconsistency.

As noted above, the Court finds that Kentucky's application of the discovery rule occurs when defendant's injury-causing conduct could not have been reasonably discovered by the plaintiff through due diligence. Defendants submit that even if the discovery rule applies, there is plenty of evidence to show plaintiffs were aware of the injuries more than five years before the action was filed, including the school's installation of an online filtering tool to filter social media sites and the superintendent's testimony that he spent 20% of his 2017 work year dealing with social media issues. (Case No. 4:23-cv-01804, Dkt. No. 45-2, Declaration of Ashley M. Simonsen

---

wronged; and, (2) by whom the wrong has been committed"); *R.T. Vanderbilt Co. v. Franklin*, 290 S.W.3d 654, 659 (Ky. Ct. App. 2009) (explaining the rule of discovery accrues if plaintiff knows "not only that he has been injured but also that his injury may have been caused by the defendant's conduct").

8

in Support of Defendant's Motion for Summary Judgment (Breathitt) ["Breathitt Simonsen Decl."], Exs. 18, 19.)

Defendants' argument fails because they conflate *content* issues with the product design or Actionable Defects at issue here. That the superintendent may have been dealing with the content generated on social media platforms speaks nothing about his knowledge of the technical product attributes. Defendants have proffered no evidence that plaintiff knew, or could have known, about defendants' Actionable Defects and the resulting damage.

Because defendants have failed to meet their burden to prove the affirmative defense, the motion is denied as to the statute of limitations.

### B. CAUSATION

Next, defendants assert that judgment should be entered because plaintiff cannot prove that their actionable conduct caused Breathitt's harms.

Kentucky law holds that "[t]he actor's negligent conduct is a legal cause of harm to another if (a) [the] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." *Holland v. United Servs. Auto. Ass'n*, 707 S.W.3d 541, 555 (Ky. Ct. App. 2025) (quoting *Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980)). "A defendant's conduct need not be the sole cause or even the primary cause of a plaintiff's injury but must only be a material element." *Id*. (internal quotations omitted).

While plaintiffs have the burden to show causation, in Kentucky, "it is well recognized that 'legal causation may be established by a quantum of circumstantial evidence.'" *Bailey v. N. Am. Refractories Co.*, 95 S.W.3d 868, 872–73 (Ky. Ct. App. 2001) (quoting *Holbrook v. Rose,* Ky., 458 S.W.2d 155, 157 (1970)). When evaluating causation, a jury may "naturally draw[] inferences from circumstantial evidence." *Id*. Such inferences, however, must be reasonable: they must indicate "the *probable,* as distinguished from a *possible* cause." *Id*. (quoting *Briner v. General Motors Corporation,* Ky., 461 S.W.2d 99, 101 (1970)).

Breathitt argues that it has provided a sufficient quantum of circumstantial evidence from which a jury could reasonably infer that defendants' actionable conduct was a "substantial factor"

9

in causing its harm. For the reasons below, the Court agrees.

### 1. Causation: Defendants' Specific Platforms

Defendants first argue that Breathitt's evidence largely relates to its students' use of smartphones or "social media" generally, and therefore it cannot show that each defendant platform caused harm. For this proposition, defendants cite to *Mullins v. Appalachian Reg'l Healthcare, Inc.*, which held that surviving summary judgment requires evidence as to "each defendant." 707 S.W.3d 1, 8 (Ky. Ct. App. 2025).

Breathitt has met that standard. Breathitt proffers evidence that each of defendants' platforms are designed to, and in fact do, engender compulsive and harmful use through the Actionable Defects. (*See generally* Dkt. No. 2356-1, Plaintiffs' Omnibus Opposition to Motion for Summary Judgment ["Omnibus Oppo."] at 12-185.) What's more, Breathitt provides evidence that its students in fact use each of defendants' platform. *See Supra* Section I(A). Additionally, Breathitt's expert opines that defendants' platforms—YouTube, TikTok, Instagram, Snapchat and Facebook—are the top five platforms used by teens, reasonably suggesting that each of defendants' platforms are widely and regularly used by the student-age population. (Dkt. No. 2368-4, Johnson Decl., Ex. 2, ¶ 30.)

Assessing the evidence collectively, Breathitt has identified evidence that each defendant's platform's Actionable Defects foster compulsive and detrimental use; that Breathitt students actually use each of defendants' platforms; and that each defendant's platforms are among the most frequently-used. A jury could reasonably infer from this evidence that it is defendants' platforms that cause Breathitt's purported harms. A genuine dispute of fact exists as to whether defendants' conduct was a "substantial factor" in causing the harm. That it may not have been "the sole cause" is not the standard. *Holland*, 707 S.W.3d at 555.

Further, defendants have not identified persuasive authority for the proposition that a plaintiff must allocate fault amongst the various defendants. That is the quintessential role of the jury once all the evidence is heard and weighed. *See, e.g., Stratton v. Parker*, 793 S.W.2d 817, 818 (Ky. 1990) (it is the "authority of a jury to apportion the liability among joint tort-feasors").

Defendants cite to *Sanderson v. Int'l Flavors & Fragrances, Inc.,* 950 F.Supp.981, 985 (C.D.Cal. 1996) to avoid this result. In that case, the plaintiff alleged that she was exposed to fragrance products on over 16,000 occasions over the course of about 18 months, but for most of those exposures she was "unable to identify the fragrance product or products to which she was exposed." *Id*. at 986. The *Sanderson* court was concerned these facts "establishe[d] only a 'mere possibility' that defendants' fragrance products were the ones that caused her injuries." *Id*. at 988. As a result, the court granted summary judgment because that "[w]hile a jury could probably find that defendants' products, *as a whole,* were a substantial factor in causing her injuries, plaintiff has no evidence whatever from which a jury could find that *any particular defendant's products* were." *Id.* at 985 (emphasis in original). For the reasons explained above, though, and unlike in *Sanderson*, the Court is not concerned that the four defendants—whose own documents confirm that the five platforms are used almost constantly by millions of teens—have been wrongly identified.

### 2.  Causation: Section 230 and the First Amendment

Next, the Court addresses defendants' claim that Breathitt's causation evidence concerns content and design features barred from liability by Section 230 and the First Amendment. As noted, Breathitt's theory is that the design of defendants' products causes compulsive and problematic use by students, which in turn causes Breathitt to incur costs.

The parties dispute the degree to which plaintiffs' claims and evidence about defendants' conduct must be separate from third-party content to avoid Section 230 immunity. Defendants note that *Lemmon v. Snap Inc.* permitted a claim to proceed because the alleged duty violated was "fully independent of [defendants'] role in monitoring or publishing third-party content," 995 F.3d 1085, 1092–93 (9th Cir. 2021), while in *Doe v. Grindr* plaintiff's negligent design claims could not proceed where "the challenged features of the App are not independent of Grindr's role as a facilitator and publisher of third-party content." 128 F.4th 1148, 1153 (9th Cir. 2025) (cert. denied). In contrast, plaintiffs point out that *Calise v. Meta Platforms, Inc.* held that "it is not enough that a claim, including its underlying facts, stems from third-party content for § 230

11

immunity to apply." 103 F.4th 732, 742 (9th Cir. 2024).

This debate is largely moot. The Court's MTD order already established that certain platform design choices—the Actionable Defects—are sufficiently independent from content to avoid Section 230. Here, Breathitt provides deposition, documentary, and expert opinion evidence that each defendant's platforms contained Actionable Defects which engender compulsive use. Breathitt also offers evidence specific to the district, including expert opinion and individual testimony, describing how social media use affects students within the school environment. Finally, Breathitt proffers affidavit and survey evidence linking students' social media use to hard costs and opportunity costs incurred by the district. This evidentiary showing, as further outlined below, creates a triable issue of fact as to each of the Actionable Defects. The issue of evidence regarding the barred features is largely one of admissibility under Federal Rule of Evidence 403, not a basis for summary judgment.

a)      <em>Defective age verification</em>

Breathitt offers evidence of each defendant's own knowledge of and failure to implement robust age verification, one of the Actionable Defects. *As to Meta*, Breathitt cites evidence that the company was aware that Facebook and Instagram were predominantly used by pre-teens; that users typically joined Instagram in middle school, at ages 11-12; and that at least 40% of children ages 9-12 reported using Facebook and Instagram daily. (*See, e.g.,* Dkt. No. 2564-17, Am. Warren Decl., Ex. 317; Dkt. No. 2562-25, Am. Warren Decl., Ex. 275; Dkt. No. 2558-43, Am. Warren Decl., Ex. 193). *As to TikTok,* Breathitt evidence exists that the company estimated that millions of underage users in the U.S. were on the platform but nonetheless failed to implement tools that would allow it to effectively verify user age. (*See, e.g.,* Dkt. No. 2566-18, Am. Warren Decl., Ex. 418 (testimony as to non-implementation of verification features); Dkt. No. 2566-20, Am. Warren Decl., Ex. 420 (over 4.7 million underage users in U.S.); Dkt. No. 2566-5, Am. Warren Decl., Ex. 405 (employees discussed underage users' ability to indicate on the platform they were 18+ to skirt age controls). *As to Snap*, Breathitt adduces evidence that Snap was "aware of" children under 13 lying about their age to skirt restrictions on account creation (Am. Dkt. No. 2574-1, Warren Decl., Ex. 801B), and of investor analysis describing middle schoolers as "rabid" users of Snapchat (Dkt. No. 2574-

12

26, Am. Warren Decl., Ex. 826) but nonetheless removed only what employees termed a "laughabl[y]" small number of under-13 accounts. (Dkt. No. 2575-27, Am. Warren Decl., Ex. 877). This despite Snap's founder and CEO conceding under oath in April 2025 that "children under the age of 13 are not ready to communicate on Snapchat." (Dkt. No. 2574-3, Am. Warren Decl., Ex. 803.) *As to YouTube*, Breathitt provides evidence that its age controls do not effectively prevent children under 13 from using the platform. (*See, e.g.*, Dkt. No. 2572-24, Am. Warren Decl., Ex. 724) ("Have we solved for u13s (especially younger ones)? Our contention is no. . . . we aren't really in a good state overall today . . . the vast majority of u13 usage is not happening in our current user-based solutions — it's happening anonymously on Y[ou]T[ube].") Breathitt also adduces evidence that YouTube was aware of the platform causing distraction in schools. (*See, e.g.*, Dkt. No. 2578-22, Am. Warren Decl., Ex. 1022.)

Breathitt also provides evidence that its students under age 13 used defendants' platforms compulsively, causing disruption to the school. (*See* Dkt. No. 2368-10, Johnson Decl., Ex. 8 (2021 Kentucky survey data reflecting that 19.2% of Breathitt sixth graders report checking social media "every couple of minutes," and another 13.7% check "every 10-15 minutes"); Dkt. No. 2368-19, Johnson Decl., Ex. 17 (affidavit of principal Jeremy Hall testifying to compulsive use of social media among fifth and sixth grade students, its impact on students' attention, and administrator time spent addressing social media-related issues).) A jury could draw the inference that, had defendants properly implemented age controls, those under-13 students would not have been able to access the platforms in the first place nor use them compulsively. Based thereon, Breathitt's evidence creates a triable issue as to whether defendants' platforms failure to offer adequate age controls was a substantial factor in causing Breathitt students' compulsive use.

### b) Defective parental controls

Breathitt proffers evidence that each defendant failed to implement effective parental controls, one of the Actionable Defects, as demonstrated by weak rollout of parental control features and low rates of adoption. More specifically, and as examples, *as to Meta*, Breathitt cites evidence that parental controls were wholly unavailable on Instagram until 2022 and Facebook until 2023, and that only 0.15% of youth Facebook accounts and 0.38% of youth Instagram

accounts are enrolled in parental controls because of how that feature was designed. (*See* Dkt. No. 2564-8, Am. Warren Decl., Ex. 308; Dkt. No. 2564-22, Am. Warren Decl., Ex. 322). *As to TikTok*, evidence exists that TikTok designed marginal parental controls so as to avoid interfering with minors' use of the platform, and policies instructed employees to ignore and reject parental requests to delete their child's account. (*See, e.g.,* Dkt. No. 2570-32, Am. Warren Decl., Ex. 632A; Dkt. No. 2567-31, Am. Warren Decl., Ex. 481). *As to Snap*, Breathitt proffers evidence that Snap does not provide traditional parental controls (i.e. the ability to restrict time spent on the platform) and has designed its parental visibility function ("Family Center") to result in very limited adoption of the features. (*See, e.g.,* Dkt. No. 2575-41, Am. Warren Decl., Ex. 891 (Snap's controls do not offer "[t]ime limits and other forms of restrictive mediation"); Dkt. No. 2575-43, Am. Warren Decl., Ex. 893) (goal of features is to "give the parent visibility but not necessarily control."); Dkt. No. 2575-44, Am. Warren Decl., Ex. 894 (Family Center "extremely hard to find" in the app, only about 0.33% of teen Snapchat users adopt the tool, and parents infrequently use it to monitor their teen's account.) Finally, *as to YouTube*, Breathitt provides evidence that the platform's parental control features are not designed to provide parents the ability to limit screen time nor curb the addictive features of the platform. (*See, e.g.*, Dkt. No. 2578-16, Am. Warren Decl., Ex. 1016 (YouTube's parental screen time controls "inadequate.")

Breathitt also brings evidence as to its students' problematic and compulsive use of defendants' platforms. (*See, e.g,* Dkt. No. 2368-7, Johnson Decl., Ex. 5 (Affidavit from Breathitt counselor testifying to "a growing problem of addictive, compulsive and problematic social media use" among students who are "unable to regulate or control their use of social media," causing that counselor to divert "the majority of [her] day . . . [to] addressing social media impacts on students" such as lack of sleep, poor academic performance, chronic stress, and other mental health issues); Dkt. No. 2368-11, Johnson Decl., Ex. 9 at 42:5–8 (Breathitt counselor "deal[s] with social media [issues] daily from students"); Dkt. No. 2368-13, Johnson Decl., Ex. 11 at 40:4-8 (Breathitt students scrolling during class); Dkt. No. 2368-6, Johnson Decl., Ex. 4 at 45:17-20 (Breathitt students on YouTube at inappropriate times).) A jury could draw the inference that, had defendants implemented adequate parental controls, those tools would have limited Breathitt student use of

defendants' platforms and avoided the resulting disruption to the district. Based thereon, Breathitt's evidence creates a triable issue as to whether defendants' failure to offer adequate parental controls was a substantial factor in causing Breathitt students' compulsive use.

c)        *Failure to assist users in limiting in-app screen time*

Breathitt adduces evidence that defendants failed to implement in-app screen time limitations, one of the Actionable Defects. *As to Meta*, evidence exists that Facebook and Instagram did not launch an opt-out feature for managing screen time out of concern for negative impact to growth and user engagement, and knew that very few teen users would ever use the feature as designed (as an opt-in setting). (*See, e.g.,* Dkt. No. 2562-11, Am. Warren Decl., Ex. 261 (users unlikely to turn on screen-time limiting features not activated by default); Dkt. No. 2562-14, Am. Warren Decl., Ex. 264 (Meta unwilling to launch opt-out feature that would negatively impact growth and engagement metrics); Am. Warren Decl., Ex. 113B at 441:21-442:2 (acknowledging projections showed that more than 99% of teen Instagram users would not use Meta's screen time limiting feature).) *As to TikTok*, Breathitt offers evidence that the company knew that minors "do not have the executive mental function to control their screen time," (Dkt. No. 2567-47, Am. Warren Decl., Ex. 497); that external studies showed that excessive screen time was linked to addiction and mental health issues, (*see, e.g.,* Dkt. No. 2569-43, Am. Warren Decl., Ex. 594); that some minors used the platform heavily, including for more than 6 hours a day, (*see, e.g.,* Dkt. No. 2570-32, Am. Warren Decl., Ex. 632B at 440:22-441:18); and that TikTok chose not to offer effective screen time management tools in the U.S. that were offered by Douyin, the Chinese version of the product. (*See, e.g., id*. at 456:1-15 (Douyin's screen-blocking reminder feature); *id*. at 473:23-476:17 (Douyin's "forced rest" feature)*; see also* Am. Warren Decl., Ex. 496 (discussing screen time restrictions and differences between Chinese and U.S. versions).) *As to Snap*, Breathitt provides evidence that Snap considered but did not implement features that would allow users to limit time spent in app, such as allowing teenagers to turn off notifications during school hours, or to temporarily pause their accounts. (*See, e.g.,* Dkt. No. 2568-46, Am. Warren Decl., Ex. 849; Dkt. No. 2568-27, Am. Warren Decl., Ex. 830B at 508:14-20 (no feature in Snapchat that permits scheduling quiet periods with no notifications); Dkt. No. 2558-32, Am. Warren Decl., Ex. 863 at

320:22-321:10 (considered but did not add ability to pause or deactivate account).) *As to YouTube*, Breathitt notes that the company launched screen time management features as opt-in tools, which rely on teens and pre-teens to self-regulate their behavior, despite YouTube knowing that young users are unable to do so effectively. (*See, e.g.,* Dkt. No. 2573-49, Am. Warren Decl., Ex. 799 (reminders for users to take breaks from watching YouTube "off by default"); Dkt. No. 2578-37, Am. Warren Decl., Ex. 1037 (teens and tweens ability to moderate behavior limited due to less developed prefrontal cortex).)

As discussed above, Breathitt also has evidence as to its students' problematic and compulsive use of defendants' platforms. Based thereon, a jury could infer that, had defendants implemented adequate tools to assist users in limiting in-app screen time, those tools would have limited Breathitt student use of defendants' platforms and avoided disruption to Breathitt schools. Breathitt's evidence is thus sufficient to create a triable issue as to whether defendants' failure to offer in-app screen time limiting tools was a substantial factor in causing Breathitt students' problematic use.

d)        *Barriers to account deactivation and/or deletion*

Breathitt provides evidence that defendants created barriers to deactivating and deleting accounts, another of the Actionable Defects. *As to Meta*, Breathitt offers evidence that Facebook and Instagram create friction in deleting or deactivating accounts to stop users from leaving. (*See, e.g.,* Dkt. No. 2577-37, Am. Warren Decl., Ex. 987, ¶¶ 91-96.) *As to TikTok*, Breathitt adduces evidence that the company designed various deterrents to prevent account deletion and deactivation, despite requests from users struggling with addiction to the platform. (*See, e.g., id*. ¶¶ 179-183.) *As to Snap*, Breathitt provides evidence that Snap erected barriers to exit including preventing users from deactivating their accounts from a mobile device, and implementing a 30-day cooling off period before an account is deleted. (*See, e.g., id*. ¶ 151.) *As to YouTube*, Breathitt recounts evidence that Google obstructs account deletion with complex settings buried within the account interface. (*See, e.g., id*. ¶¶ 219-222.) As noted previously, Breathitt also brings evidence as to its students' problematic and compulsive use of defendants' platforms. Viewed in combination, this evidence is sufficient to create a triable issue of fact.

As discussed above, plaintiffs may use circumstantial evidence to show the linkage between the Actionable Defects and the harm. Juries are routinely instructed that they may consider both direct and circumstantial evidence; the former is not mandatory. Additionally, Breathitt need not show that the Actionable Defects, standing alone, caused the disruption. *Holland*, 707 S.W.3d at 556 ("A defendant's conduct need not be the sole cause or even the primary cause of a plaintiff's injury but must only be a material element.") Rather, Breathitt may show they have sufficient evidence to argue that defendant's conduct was *a* substantial cause. Breathitt achieves this by putting forth evidence that the Actionable Defects contribute to compulsive use of the platforms which in turn causes disruption and harm to the district. The Court concludes that Breathitt has proffered at least the "quantum of evidence" required to show causation under Kentucky law. *Bailey,* 95 S.W.3d at 873.

### C. DAMAGES

Next, the Court examines whether the damages Breathitt seeks are recoverable. Under Kentucky law, damages cannot be speculative, but "where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages." *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009).

Here, Breathitt characterizes its damages as "expenditures for hard costs" and "diversion of resources." Breathitt's "hard costs" break into two categories: (i) vendor costs of $62,330 related to cellphone caddies, monitoring software, and educational programs; and (ii) property damage of $2,183 related to a TikTok challenge. (Dkt. No. 2569-23, Expert Report of Dr. Jeffrey Meyers ["Meyers Rep."], Am. Warren Decl., Ex. 574 at 1, Appx. A.) The "diversion of resources" damages reflect calculation of the value of Breathitt teacher[7] and staff time[8] spent dealing with the

---

[7] The teacher time evidence was based on a survey which asked teachers to report the number of minutes, during a typical day, diverted from teaching due to "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)" at various intervals from 2014 to the 2024-2025 school year. (Dkt. No. 2579-35, Expert Report of Dr. Robert Klein ["Klein Rep."], Am. Warren Decl., Ex. 1085 at 10, 12.)

[8] Estimated Breathitt staff time diverted due to social media was provided via sworn affidavit from Breathitt's technology director, William Noble. (Dkt. No. 2368-21, Johnson Decl., Ex. 19.)

effects of social media. Breathitt estimates lost time damages of $2.2 million to $3.0 million over the relevant time period, in a total school budget of approximately $20 million to $25 million each year of the relevant time period. (*See* Dkt. No. 2579-33, Expert Report of Dr. Bryce Ward ["Ward Rep."], Am. Warren Decl., Ex. 1083; Breathitt Simonsen Decl., Ex. 1.)

### 1.    Section 230 and First Amendment

As an initial issue, defendants charge that Breathitt's damage estimates concern "social media" generally without consideration of which features are barred by Section 230 and the First Amendment. As already explained, plaintiff may bring evidence that defendants' negligent design of their platforms, including through the Actionable Defects, contributed to its damages. That the damages evidence does not neatly segregate between the impact of various design features that are actionable or not actionable under Section 230 or the First Amendment does not vitiate the damages claim. Defendants provide no persuasive authority to the contrary.[9] Kentucky law provides that the cause must be substantial, not the sole cause. Breathitt is not barred by Section

---

[9] Defendants argue that evidence, including expert opinion, that fails to disentangle the effects of protected and unprotected features cannot be considered upon summary judgment. Defendants' non-binding authorities for that proposition do not persuade. Defendants analogize to *Weit v. Continental Illinois National Bank & Trust Co.*, wherein the Seventh Circuit affirmed the trial court's decision to exclude evidence of conduct protected by *Noerr-Pennington* that had "minimal probative value" compared to its "inevitable prejudicial effect." 641 F.2d 457, 466 (7th Cir. 1981). As *Weit* and subsequent Seventh Circuit caselaw makes clear, evidence regarding conduct protected by a rule of law *can* "be excluded under Fed.R.Evid. R. 403 if confusing or unduly prejudicial, but there is no blanket rule of inadmissibility." *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 789 (7th Cir. 1999) (trial court "erred in treating the [*Noerr-Pennington*] doctrine as a rule of evidence that forbids the introduction of evidence"). Defendants also cite to antitrust and patent cases where experts were required to apportion their opinions. *See Wirtgen Am., Inc. v. Caterpillar, Inc.*, 715 F.Supp.3d 587, 591 (D. Del. 2024); *Litton Systems, Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. 1996). Those cases rely on caselaw and propositions specific to the antitrust and patent fields, and the Court declines to extend their principles to the Section 230 context. *See Wirtgen*, 715 F.Supp.3d at 591-92 (issues "unique to patent law," including the "rule of apportionment," governed by law of the Federal Circuit rather than the regional circuits); *Litton*, 1996 WL 634213, at *2 ("an antitrust plaintiff [must] disaggregate its damage model except where it is impossible to do so.") At trial, the Court will deal with evidence according to Rule 403, which permits the Court to exclude from consideration evidence for which the "probative value is substantially outweighed by a danger" of unfair prejudice or jury confusion. Fed. R. Evid. 403.

230 or the First Amendment from bringing evidence of damages from social media use. That said, the presentation of such evidence is regulated by Federal Rule of Evidence 403.

Similarly, defendants argue that Breathitt's damage evidence fails because it does not distinguish between the defendants' various platforms. Here, defendants challenge Breathitt's "lost time" teacher survey as inadmissible on the grounds it asked teachers about "social media" generally, not just defendants' platforms. Having reviewed the survey, the Court finds that defendants exaggerate. The survey asked teachers to report how much time was diverted from teaching due to "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)." (Klein Rep at 10, 12.) It is true that the survey question uses the terms "e.g." and "etc.," which indicate a non-exhaustive list. The question, though, plainly asks about each defendant's platforms: Facebook, Instagram, Snapchat, TikTok, and YouTube. Drawing all inferences in Breathitt's favor, a jury could reasonably conclude that when teachers were asked about time diverted because of "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)," those teachers considered—at least in substantial part—the five platforms explicitly named in the question. *Walls*, 653 F.3d at 966 (courts must "draw all inferences supported by the evidence in favor of the non-moving party"). The objection is overruled as it goes to weight, not admissibility.

### 2.    Lost Time

With respect to lost time specifically, Breathitt seeks damages for opportunity cost of time district teachers and administrators spent dealing with issues arising from compulsive social media use, rather than the duties they are paid to perform. Defendants argue that Kentucky law prohibits recovery of such damages because they are untethered from any financial outlays or specific lost earnings. Defendants rely on *Gassaway Constr. Co. v. Gentry*, 264 S.W.2d 658, 659 (Ky. 1954) and *Hellmueller Baking Co. v. Risen*, 174 S.W.3d 134, 137 (Ky. 1943). Neither stand for the general proposition asserted.

*Gassaway* concerned lost time damages of both a driver and passenger struck by a truck. There, the driver sought only $1,200 in lost time damages and the passenger had a minimal claim of lost time damages on her part (i.e., "sparse" evidence, only a "temporary" loss of time, and no "specific earnings" lost). *Gassaway,* 264 S.W.2d at 659. Nonetheless, the trial court "apparently inadvertently" instructed the jury to consider up to $10,000 in lost time damages to both plaintiffs.

*Id.* at 658. The Kentucky Court of Appeals reversed, concluding the instructions regarding the ability to consider damages of up to $10,000 were issued in error and prejudicial as they authorized a very substantial[10] damages figure untethered to the plaintiffs' claims. Nowhere does *Gassaway* suggest, however, that Kentucky law bars recovery of lost time damages without a showing of specific earnings loss.

In *Hellmueller*, the Kentucky Court of Appeals declined to overturn a jury award to a truck driver who was struck by another driver. There, the appellant argued that the jury instruction—which directed the jury to "compensate [plaintiff] for the time lost by him, if any, from his usual employment . . . not exceeding $39 per week and not exceeding in all the sum of $1000.00"—failed to "incorporate the words 'if any'." *Hellmueller*, 174 S.W.3d at 137. As the court pointed out, the instruction plainly did. *Id*. Although *Hellmueller*'s jury instruction involved lost earnings, the case nowhere suggests that Kentucky law, as a general matter, bars recovery of lost time damages absent lost earnings. In contrast, as a federal court applying Kentucky law recently noted, "[l]ost time and opportunity costs associated with attempting to mitigate the actual consequences of [the harm]" are of the type that "[c]ourts have routinely upheld." *Lurry v. PharMerica Corp.*, 2024 WL 2965642, at *3 (W.D. Ky.). As a result, the Court declines to grant summary judgment on the basis that lost time is not recoverable in the absence of evidence of lost earnings.

Next, defendants contend that even if lost time damages were recoverable, Breathitt does not have admissible evidence of lost administrator and teacher time. As to the former, defendants argue that Will Noble, Breathitt's Information Technology ("IT") director, admits that his affidavit, which conveys that his IT colleagues spent up to 15 percent of their time addressing social media issues, was based on conversations with unnamed employees. (Dkt. No. 2368-21, Johnson Decl, Ex. 19 ¶ 11; Dkt. No. 2368-26, Johnson Decl., Ex. 24, 32:1–33:7.) Defendants compare Noble's declaration to *Block v. City of Los Angeles*, where the Ninth Circuit concluded an affidavit was hearsay when it simply summarized what city personnel officers told the affiant about employee disciplinary suspensions, the subject of the litigation. 253 F.3d 410, 417-19 (9th Cir. 2001).

---

[10] $10,000 in 1952 would be worth approximately $122,000 today. Bureau of Labor Statistics' CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm.

20

The analogy to *Block* is inapt. There, the affiant in question "was not personally involved in any of the disciplinary suspensions" and "did not personally review any business records containing information regarding such disciplinary suspensions," but instead "relied on information from (unsworn) departmental personnel officers, and the source of these officers' information is unclear." *Id*. Here, Noble's declaration makes clear he has first-hand knowledge. (Dkt. No. 2368-21, Johnson Decl, Ex. 19 ¶ 6 ("I oversee the implementation and maintenance of multiple methods of attempting to prevent and/or limit students use of social media at school and on school issued devices."); *id*. at 10 ("The time that my staff has to spend on social media related impacts on students has substantially increased in the nearly 12 years that I have worked at Breathitt County Schools."). The deposition testimony cited by defendants, moreover, suggests only that Noble spoke to other Breathitt IT employees to help him recall the information he discusses in his affidavit—not that he parroted their own impressions. (Dkt. No. 2368-26, Johnson Decl., Ex. 24, 32:1–33:7.)[11]

The motion as to this ground is denied.

### 3.    Out-Of-Pocket Costs

In addition, Breathitt asserts that defendants' conduct caused it to incur over $60,000 in "hard costs" or out-of-pocket damages. Breathitt's out-of-pocket damages expert multiplied Breathitt's relevant expenditures by "Allocation Percent(s) detailed by Breathitt" through affidavits. (Dkt. No. 2368-25, Johnson Decl., Ex. 23, ¶ 22.) The affidavit of Breathitt Superintendent Phil Watts, for example, provides estimated percentages, ranging from twenty to one hundred percent, of the district's expenditures on certain vendors (e.g., third-party educational programming, monitoring software, cell phone holders, and property repair) incurred because of defendants' conduct. (Dkt. No. 2368-23, Johnson Decl., Ex. 21, ¶¶ 9-10.)

Defendants argue that Breathitt's hard costs damages lack a reliable and admissible reliable basis. While defendants may challenge these estimates at trial, Breathitt has proffered sufficient support, including through Watts' affidavit and deposition testimony, to create a dispute of material fact. (*See, e.g., id.;* Dkt. No. 2368-22, Johnson Decl., Ex. 20, 148:18-21 (hard cost expenditures

---

[11] As the Court will address in its forthcoming Order on Defendants' Motion to Exclude SD Experts, Klein's survey evidence regarding lost teacher time is likewise admissible.

included "software that teachers use to keep kids from going to websites like Facebook or other social media websites during class"); Dkt. No. 2368-9, Johnson Decl., Ex. 7, 58:1-8 (property damage connected to student use of TikTok); *id*., 58:9-15 (cell phone holder expenditures related to student social media use).)

The Court denies the motion on this ground.

## A. REMEDIES FOR FUTURE HARM

Defendants argue the proposed 15-year strategic plan is not a cognizable remedy because (1) the costs of implementing the plan are not recoverable as future damages; (2) federal common law bars equitable relief because a legal remedy (money damages) is available for plaintiff's negligence and nuisance claims; and (3) Kentucky law does not permit this type of equitable relief.

### 1.    Future Damages

Kentucky law requires a plaintiff seeking future damages to prove (a) that there is an ongoing injury and (b) the costs of remediation. *May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct. App. 2010) ("The test is whether there is evidence to indicate that the plaintiff's [damages] are *likely* to continue to occur."). All parties rely on *May* but interpret it differently.

Defendants primarily urge that the proffered future damages do not meet Kentucky's requirement that future damages be "reasonably certain" to occur.[12] Defendants contend that the damages are uncertain because the plan is a recommendation, not a necessity, to address plaintiff's injuries. Plaintiff disagrees, asserting that it has provided sufficient evidence through Dr. Hoover's and Dr. Leslie's reports. (Dkt. No. 2577-50, Am. Warren Decl., Ex. 1000; Dkt. No. 2570-9, Am. Warren Decl., Ex. 609.)[13] Dr. Hoover opines on the defendants' impact on school operations, school climate and environment, learning and performance, teaching effectiveness and classroom dynamics, teacher morale and job satisfaction, and student mental health, and proposes a plan to

---

[12] Defendants also argue that the plan has never been implemented nor found "necessary or advisable" by any professional organization. However, defendants' products are part of a relatively new industry. Defendants do not cite to any authority that requires the proposed plan have been previously implemented and peer reviewed, especially where new technology products are involved.

[13] The Court addresses defendants' objections to Dr. Hoover and Dr. Leslie in forthcoming orders on defendants' Rule 702 motions. Both experts' reports are admissible under Rule 702.

address those impacts; Dr. Leslie, in turn, focuses on the costs of that plan. (Dkt. No. 2577-50, Am. Warren Decl., Ex. 1000.) Plaintiff asserts that Dr. Hoover's plan involves not merely recommendations but rather "evidence-based" requirements. (*See* Dkt. No. 2580-1, Am. Warren Decl., Ex. 1101 ¶ 41.)

Because there is a genuine dispute as to whether the future damages in question here are reasonably certain to occur, the motion as to this issue is denied.

### 2. Availability of Equitable Remedy Under Federal Common Law

In *Sonner v. Premier Nutrition Corp.*, the Ninth Circuit found that federal common law applies to state law claims for equitable restitution and held that plaintiffs must establish that they lack "an adequate remedy at law before securing equitable restitution for past harm . . . ." 971 F.3d 834, 844 (9th Cir. 2020).

Here, plaintiff pursues a Kentucky common law nuisance claim. Still, federal common law applies. Federal courts have long limited equitable relief because "a suit in equity [that would] accomplish a result which could be attained by an action at law . . . would deprive the litigant of his constitutional right to a trial by jury in the law action." 14 WRIGHT AND MILLER'S FEDERAL PRACTICE AND PROCEDURE § 4513 (3d ed. 2016) (quoting *The Effect of State Statutes on Equity Jurisdiction in the Federal Courts*, 33 Yale L.J. 193, 195 (1923)). When an adequate remedy at law is available to address defendant's injurious conduct, a plaintiff may not also pursue equitable relief. Plaintiffs ask the Court to determine "whether abatement is or is not duplicative of a damages award . . . post-trial." (P Omni. Oppo. at 211.) The request contravenes the principle cited. By the time of summary judgment, plaintiffs should understand their case and the nature of the requested damages. *See Swartz v. Dave's Killer Bread*, Case No. 4:21-cv-10053-YGR, Order Addressing Cross-Motions for Summary Judgment in Part (N.D. Cal 2025) ("summary judgment may be the best stage at which to address *Sonner* issues" as opposed to a motion to dismiss).

Here, plaintiff seeks abatement as a distinct equitable remedy to eliminate ongoing and future public harms, in the alternative to the future damages they seek.[14] However, when pressed to

---

[14] To the extent defendants argue that plaintiffs cannot seek legal damages, the Court disagrees.

define their request for equitable relief given that the briefing indicated that it would be a Court-fashioned abatement plan based upon Dr. Hoover's report, plaintiff explained in the proceeding on January 26, 2026 that they would ask this Court to award whatever costs for the Hoover plan are not awarded by a jury at trial. This approach is inconsistent with federal common law.

As described in *Sonner*, when a plaintiff is seeking "the same amount of money for the exact same harm," plaintiff must be able to explain why the available legal remedy is not adequate. 971 F.3d at 844. Plaintiff argues that the future damages it requests (the cost of implementing Dr. Hoover's 15-year strategic plan) is not equivalent to the equitable remedy (an abatement plan modeled off of the Hoover plan). The Court is not convinced. Plaintiffs make no effort to demonstrate how the Court-fashioned equitable abatement plan would differ from the damages they request. In fact, plaintiffs argue they should be allowed to pursue these two remedies in the alternative even through trial, essentially providing two bites at the apple. This is precisely the kind of redundancy the Ninth Circuit prohibited in *Sonner*.

Because no meaningful difference exists between the two remedies plaintiff seeks (future damages equal to the cost of the Hoover plan and equitable abatement in the form of the Hoover plan), the Court finds that equitable abatement requiring implementation of the Hoover plan is barred by the availability of the adequate legal remedy.

At the January 26 proceeding, although it was not addressed in defendant's motion, plaintiff urged the Court to allow its request for injunctive relief to proceed. Defendants argued that any injunction would also be barred by *Sonner*.

The Ninth Circuit has not yet addressed the question of whether injunctive relief lies in the scope of *Sonner*. However, many courts post-*Sonner* have held that where "[m]oney damages are an inadequate remedy for [the] future harm" plaintiffs may pursue remedial injunctive relief. *Linton v. Axcess Fin. Servs., Inc.*, 2023 WL 4297568, at *3 (N.D. Cal. 2023) (collecting cases). Thus, plaintiffs can pursue injunctive relief if they demonstrate that it would remedy harm that cannot be addressed by their available legal remedy.

Here, the Court finds that while plaintiffs seek future damages for the long-term effects of injuries defendants have already caused, federal common law does not bar injunctive relief as an appropriately independent remedy meant to address harm from an enduring nuisance.

24

### 3.    Availability of Equitable Remedy Under Kentucky Law

Next, defendants argue that the equitable remedy is not available, in any event, under Kentucky law because it only allows for abatement of a defendant's *conduct* and plaintiffs have conceded that the Hoover plan does not aim to change defendants' conduct in any way. Further, under Kentucky law, plaintiffs may not seek the equitable remedy of abatement unless they lack an adequate remedy at law. *Hughes v. Call*, 294 S.W.2d 532 (Ky. 1956). As explained above, the Court will not permit plaintiffs to pursue the Hoover plan in the form of an equitable abatement.

As defendants concede in their briefing, injunctive relief is precisely the kind of equitable abatement Kentucky law envisions. *See* Ky. L of Damages § 31:8. Therefore, the Court will permit plaintiffs to pursue injunctive relief for their nuisance claim and, if appropriate, conduct evidentiary hearings on the nature and scope of such relief.

### B.  FAILURE TO WARN

#### 1.    Duty to Warn the School District

Defendants argue that Kentucky law does not impose a duty to warn non-users of foreseeable harm caused by their products.[15]

As this Court explained in the MTD Order, to determine whether a duty is owed, some states assess a set of factors that include: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community of imposing a legal duty to exercise care. Other jurisdictions frame the duty analysis in terms of the foreseeable consequences and reasonableness of defendants' alleged risk-creating conduct. (*See* MTD Order, 27-28.)

"While each state articulates its own framework, three fundamental considerations emerge: (1) the relationship between the parties, in particular, the relationship between the defendant's

---

[15] Defendants also argue that they do not owe a duty because the alleged injury (1) results from a third-party's use of the product and (2) is a purely financial injury. However, as the Court explained in its MTD Order, Kentucky law only applies the economic loss doctrine where the plaintiff was in privity with the defendant. Because that is not the case here, this argument fails. (*See* MTD Order at 39.) Defendants provide no reason to reconsider this earlier ruling.

conduct and the plaintiff's injury; (2) the foreseeability of the plaintiff's injury; and (3) public policy concerns." (*Id.* at 28.) In prior orders, this Court determined that there is "sufficient juxtaposition of the parties in time and space to place [plaintiffs] in danger from [defendants'] acts." (*Id.* at 29.) The Court also explained that public policy did not weigh against these claims for potential exposure "to tenuous claims from unbounded categories of plaintiffs" because they "are no more expansive than defendants' own intentional and targeted actions to specific schools, especially given the narrowing of the claims which have excluded those claims based on third-party conduct." (*Id.* at 32.) Defendants continue to object to this articulation. The Court finds no basis to reconsider its prior analysis.

With respect to Kentucky specifically, that state imposes a duty on "every person . . . to exercise ordinary care . . . to prevent foreseeable injury." *Stiens v. Bausch & Lomb Inc.*, 626 S.W.3d 191, 200 (Ky. Ct. App. 2020); *Grayson Fraternal Ord. of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987). Kentucky courts find a duty to warn when a defendant "knew or should have known" that their product created a foreseeable risk of harm to the plaintiff. *Stiens v. Bausch & Lomb Inc.*, 626 S.W.3d 191, 202 (Ky. Ct. App. 2020). Generally, whether the defendant knew or should have known is a question for the jury. *See, e.g., Jones v. IC Bus, LLC*, 103 U.C.C. Rep. Serv. 2d 71 (Ky. Ct. App. 2020) (review denied) (Aug. 18, 2021) (finding whether defendant was obligated to warn purchasers and end users of the dangers of its products was an issue for the jury).

Defendants do not focus on the element of whether they were aware that their products were potentially harmful. Rather, they focus on whether evidence exists that defendants knew or should have known of foreseeable harm to "school districts" specifically resulting from students' compulsive use of the products.[16] Defendants stress that there is no evidence they "targeted" schools or school districts. Yet plaintiffs cite to a whole trove of evidence to support their theory

---

[16] On the question of whether courts can find a defendant owed a duty to warn non-users of the risks of the defendant's product, defendants only discuss one case from Kentucky, *Williams v. Schneider Elec. USA, Inc.*, 2023 WL 4374514 (Ky. Ct. App. 2023). In *Schneider*, the Court found that defendant manufacturer owed a duty to warn an employee's daughter of risks of exposure to asbestos. Because the remaining cases cited are from other jurisdictions, they do not persuade on this question of Kentucky law.

that defendants did not merely passively target school-aged students, but in fact specifically targeted school districts via a "years-long campaign."

For example, plaintiffs provide evidence of such a campaign by Meta that includes specifically targeting their growth strategies on a school-level basis by identifying students' school affiliations (*see* Dkt. No. 2554-40, Am. Warren Decl., Ex. 40 (discussing need to acquire "databases of US high schools" for this purpose)); intentionally driving growth on a "high-school-by-high-school basis" (Dkt. No. 2554-44, Am. Warren Decl., Ex. 44 at 0316) (*see also* Dkt. No. 2555-3, Am. Warren Decl. Ex. 53 at 7145 (discussing leveraging school networks for growth, including using classmates' data for content and contact discovery recommendations)); recruiting teenage users "to act as our plug at local high schools" (Dkt. No. 2555-18, Am. Warren Decl., Ex. 68); and even targeting school communities with "school blasts" to "tip schools from inactive to active via network effects and incrementally increase teen [monthly active persons] in those schools" (Dkt. No. 2555-4, Am. Warren Decl. Ex., 54 at 9227).

Plaintiffs provide similar evidence to support their theory *as to Snap* (*see, e.g.,* Dkt. No. 2575-10, Am. Warren Decl., Ex. 860 (internal document stating "The start of the school year is a top engagement day on Snapchat"); Dkt. No. 2574-24, Ex. 824 (Snap founder Evan Spiegel wrote he was "thrilled to hear that most [users] were high school students who were using Snapchat as a new way to pass notes in class—behind-the-back photos of teachers" and that usage peaked during the school day but dipped on weekends)); *TikTok* (*see, e.g.,* Dkt. No. 2566-37, Ex. 437 (discussing back-to-school advertising efforts that "tune into [] hashtag high school . . . You'll be the coolest kid in school in no time.")); and *YouTube* (*see, e.g.,* Dkt. No. 2572-41, Ex. 741 (internal document noting "Kids under 13 are the fastest-growing Internet audience in the world" and "Investing in schools helps onboard kids into Google's ecosystem . . . If you get someone on your operating system early, then you get that loyalty early, and potentially for life")). *See also supra* at 3.

Plaintiffs also point to defendants' outreach and relationship-building with organizations embedded in schools, such as the national PTA and Scholastic, as evidence of defendants' efforts to "normalize its products under the guise of education and safety." The audience for many of these efforts included school teachers, such as Meta's "digital citizenship" program "[d]esigned with teachers in mind." (Dkt. No. 2555-10, Am. Warren Decl., Ex. 60.)

27

This evidence creates triable issues regarding defendants' knowledge that they were aware their products induced compulsive use, that they specifically targeted users they knew were school-age students for use during the school day, and that such use could foreseeably cause harm to school districts specifically.

### 2.    Causation

Next, defendants contend that a failure to warn claim fails because there is no evidence that a warning would have prevented the alleged injury. Plaintiff counters that (a) Kentucky law authorizes a rebuttable presumption, namely that if defendant had issued a warning, it would have been heeded and plaintiff would have minimized the risk; and (b) there is no record evidence that suggests a warning would not have been heeded.

### a)    *Heeding Presumption*

With respect to the rebuttable presumption, plaintiff relies on *Snawder v. Cohen* for the proposition that where a defendant has a duty to warn a plaintiff, that plaintiff would have heeded a warning and acted to minimize the risk. 804 F.Supp.910, 911 (W.D. KY 1992). Defendants urge that *Snawder* is more limited, namely that it only applies in cases involving physical injury, "such as warning of allergic reactions to ingredients or poisonous drugs." *Snawder*, 804 F.Supp. at 911. However, defendants do not cite to any authority that limits the heeding presumption in this manner. Therefore, the heeding presumption applies.[17] However, defendants can attempt to rebut the presumption by providing evidence that plaintiffs would not have heeded a warning. *Papineau v. Brake Supply Co., Inc.*, 2022 WL 22902586, at *2 (W.D. Ky. 2022).

### b)    *Whether Failure to Warn Caused the Injury*

Defendants contend that they have adduced sufficient evidence to show that Breathitt would not have acted to minimize the risk if warned because there is (1) no support for it in plaintiffs' expert testimony; (2) no evidence in the record of what the warning should have looked like; and (3) no evidence in the record to show a warning would have reduced plaintiffs' injuries.

---

[17] Further, even if no presumption existed, plaintiff would still prevail on this issue, because there is a genuine dispute as to whether the school district would have acted to minimize the risk if warned, as discussed in the next subsection.

*First,* Kentucky law requires expert testimony in negligence cases, except when the defendant's negligence would be apparent to a layperson. *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009). This requirement has been imposed where a jury would otherwise be called upon to determine the standard of care in cases involving complicated subject matter, such as professional malpractice or industry practices "with which the ordinary layman has had little or no experience." *Adkins v. CSX Transp., Inc.*, 2011 WL 2935399 at *4 (Ky. Ct. App. 2011). Questions of causation may also require expert testimony, for example in cases where multiple confounding variables may have contributed to a plaintiff's illness. Here, plaintiffs have provided expert testimony that defendants' failure to warn exacerbated plaintiff's injuries resulting from students' compulsive use of defendants' products. (Dkt. No. 2648-45, Ex. 997 Dr. Seth Noar Expert Report ¶¶ 214-48; Ex. 989 Tim Estes Expert Report ¶ 316.)

*Second,* defendants fail to identify any authority to support their contention that a plaintiff must identify what the warning would look like to establish failure to warn liability. Defendants' social media products are part of a wave of new technology that poses many new legal questions across the industry. That a model warning does not exist for this case is not surprising nor is it dispositive. It is not the role of juries to determine the specific wording of a warning, only that one should have been provided. In fact, the nature of an appropriate warning, if any, is precisely the type of injunctive relief that courts could award.

*Third,* defendants argue that plaintiff's ongoing use of social media to communicate with parents and students, even after the filing of this lawsuit, demonstrates that a warning would not have led to plaintiffs acting to minimize the alleged injuries. The Court does not find this persuasive. That school districts continue to use social media, including defendants' products, to communicate with parents and students is not conclusive evidence that they would not have acted to minimize risk if warned. Plaintiff has identified other ways Breathitt could have acted to minimize the risk if warned, including implementing cell phone-related policies that are currently in place years earlier. (Dkt. No. 2554-7, Ex. 7 at 58:12–15 (for the 2023-2024 school year, BHS purchased containers for cell phone storage during class).)

Because genuine disputes of material fact exist as to plaintiff's claim that defendants failed to warn the districts of foreseeable harm, defendant's motion is denied as to this claim.

29

### 3.    Section 230 and the First Amendment

Although it was not extensively briefed in the parties' papers, at the January 26, 2026 proceeding, the parties raised the issue of whether plaintiff's failure to warn claim can proceed on the basis of the design features this Court held were barred from liability by Section 230 and the First Amendment, in addition to the Actionable Defects. In the MTD Order, the Court stated "at this stage the Court declines to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general." (MTD Order at 45.)

"Although § 230 is broad, it does not provide 'a general immunity from liability deriving from third-party content.'" *Grindr* at 1151 (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)). As applied to state law claims, it "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id.* at 1100–01. "If the duty does not derive from such status or conduct, but rather from another source, then § 230 does not immunize the defendant." *Doe v. Grindr Inc.* at 1151 (citing *Calise* at 740).

The Ninth Circuit has explained Section 230 bars claims seeking liability "based on the defendant's failure to remove any user content or on the defendant's publishing or monitoring of third-party content." *Id.* at 1154. However, failure to warn claims may be actionable if the duty does not derive from "the defendant's status or conduct as a publisher or speaker[] . . . but rather from another source." *Id.* One example of an actionable failure to warn claim is found in *Internet Brands*, in which "plaintiff faulted the defendant for failing to warn her about information it obtained from an outside source." *Id.* at 1154 (cleaned up). Unlike in *Grindr*, in *Internet Brands*, the plaintiff alleged that the defendant had independent knowledge that its website had created a specific risk of harm. *Id.*

Therefore, plaintiffs may pursue failure to warn claims only if the duty derives from defendants' independent knowledge of a foreseeable risk of harm. Defendants do not owe a duty "to warn users of a general possibility of harm." *Grindr* at 1154 (internal quotations omitted). Here,

30

as noted above, plaintiffs have proffered evidence of independent knowledge of harm from specific features.

### 4. Duty to Warn Students

Finally, the parties dispute whether defendants' failure to warn student users, resulting in harm flowing to the districts, is independently actionable. Defendants assert that Kentucky law does not permit such failure to warn liability because the warning at issue would go to a third party and not the plaintiff.

There is no meaningful distinction warranting separate analysis here. The failure to warn in question is the failure to warn *anyone* who would be foreseeably harmed – inclusive of students, parents, and school districts. Defendants do not suggest that they issued a warning to some but not all or that such separate warnings could even be issued. Therefore, this distinction is irrelevant.

## V.   CONCLUSION

Defendants' motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**

This terminates Dkt. No. 2288 in Case No. 22-md-03047 and Dkt. No. 44 in Case No. 23-cv-01804.

Dated:   February 9, 2026

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**